## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STEPHEN MULLICAN AND KELLEY MULLICAN, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. CIV-23-160-G |
| STATE FARM FIRE AND CASUALTY COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT

Andrew J. Morris, OBA #31658
Peyton S. Howell, OBA #33917
McAfee & Taft A Professional Corporation
Eighth Floor, Two Leadership Square
211 North Robinson Avenue
Oklahoma City, OK 73102
Telephone:      (405) 235-9621
Facsimile:      (405) 235-0439
andrew.morris@mcafeetaft.com
peyton.howell@mcafeetaft.com

Jessica L. Dickerson, OBA #21500
McAfee & Taft A Professional Corp.
Williams Center Tower II
Two West Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone:      (918) 587-0000
Facsimile:      (918) 599-9317
jessica.dickerson@mcafeetaft.com

***Attorneys for Defendant State Farm
Fire and Casualty Company***

# TABLE OF CONTENTS

MOTION ................................................................................................................. 1

BRIEF IN SUPPORT ............................................................................................ 1

INTRODUCTION AND BACKGROUND ........................................................ 1

STANDARD OF DECISION ............................................................................ 4

UNDISPUTED MATERIAL FACTS ............................................................... 4

    A.    Plaintiffs' insurance policy and the initiation of their insurance claim. ............................................................................ 4

    B.    Plaintiffs' claim for dwelling benefits. .............................................. 6

    C.    Plaintiffs' claim for personal property benefits. ............................. 10

    D.    Plaintiffs' claim for loss of use benefits. ......................................... 12

    E.    Plaintiffs' admitted litigation positions. .......................................... 13

ARGUMENTS AND AUTHORITIES ............................................................. 14

    I.    Plaintiffs lack any evidence in support of their contract claim. ................................................................................... 14

    II.    Plaintiffs' bad faith claim cannot survive. ...................................... 20

        a.    Plaintiffs' bad faith claim fails because there is no breach of contract. .............................................................. 21

        b.    Alternatively, Plaintiffs' bad faith claim fails under the burden-shifting framework. .............................................. 21

    III.    Plaintiffs cannot recover punitive damages. ................................... 28

CONCLUSION ................................................................................................ 30

### TABLE OF AUTHORITIES

**Judicial Opinions**                                                              **Page(s)**

*Agrawal v. Farmers Ins. Co.*,
No. 11-CV-87-GKF-TLW,
2012 WL 124547 (N.D. Okla. Jan. 17, 2012) ............................................................. 30

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................................... 4

*Badillo v. Mid Century Ins. Co.*,
2005 OK 48, 121 P.3d 1080 ........................................................................................ 29

*Ball v. Wilshire Ins. Co.*,
2009 OK 38, 221 P.3d 717 .......................................................................................... 20

*Bayro v. State Farm Fire & Cas. Co.*,
No. CIV-14-1084-D, 2015 WL 4717166 (W.D. Okla. Aug. 7, 2015) ......................... 14

*Champagne Metals v. Ken-Mac Metals, Inc.*,
458 F.3d 1073 (10th Cir. 2006) ................................................................................... 4

*Choctaw Express Mart, Inc. v. Emp'rs Mut. Cas. Co.*,
No. CIV-14-1227-HE, 2015 WL 1014774 (W.D. Okla. Mar. 9, 2015) ...................... 28

*Christian v. Am. Home Assurance Co.*,
577 P.2d 899 (Okla. 1977) .......................................................................................... 22

*Cimarex Energy Co. v. Calhoon*,
Nos. CIV-11-525, CIV-11-725-D,
2012 WL 1371386 (W.D. Okla. Apr. 19, 2012) ....................................................28-29

*Cordis v. State Farm Mut. Auto. Ins. Co.*,
No. CIV-21-873-D, 2022 WL 4543223 (W.D. Okla. Sept. 28, 2022) ........................ 23

*Curtis v. Progressive N. Ins. Co.*,
No. CIV-17-1076-PRW, 2022 WL 109003 (W.D. Okla. Jan. 11, 2022) ...............20-21

*Dodson v. St. Paul Ins. Co.*,
812 P.2d 372 (Okla. 1991) .......................................................................................... 20

*Emmanuel Baptist Church v. State Farm Fire & Cas. Co.*,
  No. CIV-11-594-D, 2012 WL 3595093 (W.D. Okla. Aug. 21, 2012)..........4, 20-21, 25

*Evans v. Liberty Nat'l Life Ins. Co.*,
  No. 13-CV-390-CVE-PJC,
  2015 WL 1650192 (N.D. Okla. Apr. 14, 2015)............................................................ 27

*Great W. Motor Lines, Inc. v. Cozard*,
  417 P.2d 575 (Okla. 1966) .......................................................................................... 14

*Harris v. Progressive Direct Ins. Co.*,
  No. CIV-15-1252-HE, 2016 WL 9022439 (W.D. Okla. Sept. 14, 2016).................... 23

*Hartsfield v. Farmers Ins. Co.*,
  No. CIV-10-585-C, 2011 WL 2680840, (W.D. Okla. July 8, 2011) ........................... 28

*Hellard v. Mid Century Ins. Co.*,
  No. 19-CV-43-GKF-CDL, 2021 WL 249917 (N.D. Okla. Feb. 8, 2021) ................... 23

*Miller v. CSAA Gen. Ins. Co.*,
  609 F. Supp. 3d 1226 (N.D. Okla. 2022) .................................................................... 19

*Moore v. Allstate Ins. Co.*,
  No. CIV-12-652-D, 2014 WL 200777 (W.D. Okla. Jan. 17, 2014) ........................... 30

*Oulds v Principal Mut. Life Ins. Co.*,
  6 F.3d 1431 (10th Cir. 1993) ...................................................................................... 24

*Porter v. Okla. Farm Bureau Mut. Ins. Co.*,
  2014 OK 50, 330 P.3d 511.......................................................................................... 22

*Rivera v. Hartford Ins. Co. of the Midwest*,
  No. CIV-14-1082-HE, 2015 WL 1014633 (W.D. Okla. Mar. 9, 2015) ..................... 28

*Shelton v. Sha Ent, LLC*,
  No. CIV-20-644-D, 2021 WL 1407968 (W.D. Okla. Apr. 14, 2021) ......................... 14

*Shotts v. GEICO Gen. Ins. Co.*,
  943 F.3d 1304 (10th Cir. 2019) ................................................................. 21-22, 25-27

*Timmons v. Royal Globe Ins. Co.*,
   653 P.2d 907(Okla. 1982) ............................................................................... 30

*Unterkircher v. State Farm Fire & Cas. Co.*,
   No. CIV-21-897-D, 2022 WL 16936039 (W.D. Okla. Nov. 14, 2022).................24-25

*Willis v. Midland Risk Ins. Co.*,
   42 F.3d 607 (10th Cir. 1994) ........................................................................... 29

**Statutes**                                                          **Page(s)**

Okla. Stat. tit. 23, § 9.1 .................................................................................... 29

Okla. Stat. tit. 23, § 21 ..................................................................................... 14

**Rules and Regulations**                                            **Page(s)**

Federal Rule of Civil Procedure 56(a)................................................................. 4

## MOTION

Pursuant to Federal Rule of Civil Procedure 56(a), Defendant State Farm Fire and Casualty Company ("State Farm") requests that the Court grant summary judgment in its favor on Plaintiffs' claims for breach of contract and for breach of the duty of good faith and fair dealing (also known as a "bad faith claim"). *See* Pet., ECF No. 1-1. Plaintiffs' contentions with regard to both claims are (i) that State Farm was not allowed to pay actual cash value (instead of the replacement costs) for their dwelling and personal property benefits, (ii) that State Farm was required to continue paying Plaintiffs to live at a location other than their home—after already paying for them to do so for approximately nine months—via loss-of-use benefits when Plaintiffs had not begun to repair the dwelling *and* they had sold their home to a third party so they could settle elsewhere, and (iii) State Farm's adjuster did not adequately reconcile different estimates for repairs from Plaintiffs' public adjuster and from State Farm—though Plaintiffs could not identify any specific deficiencies in that analysis. None of Plaintiffs' complaints about how their insurance claim was handled has any basis in law, in the facts, or in the contract of insurance entered into by them and State Farm. Accordingly, summary judgment is proper.

## BRIEF IN SUPPORT

## INTRODUCTION AND BACKGROUND

Plaintiffs Stephen and Kelley Mullican owned a home in Newalla, Oklahoma, which suffered a fire in October 2020. They submitted an insurance claim to State Farm on the date of the loss, and State Farm paid them an advance for their personal property loss the next day. State Farm then inspected the property within five days.

Due to the cause of the fire being unclear, State Farm employed an origin and cause specialist to determine, if possible, how the fire started. Despite the time required for this additional investigation regarding the fire's cause, as well as delays caused by the COVID-19 pandemic and the October 2020 ice storm that affected Oklahoma City, State Farm issued payment for the actual cash value of the property's repairs ($133,002.73) to Plaintiffs on November 20, 2020—just 29 days after their loss occurred.

After the fire, Plaintiffs were unable to live in the home, so State Farm paid them loss of use benefits[1]—enough for them to live at rental properties for more than nine months. State Farm did so without complaint despite Plaintiffs' chosen contractor estimating that repairs to the home would only take four to seven months. Additionally, the time period for which loss of use benefits were paid extended *past* the date that Plaintiffs sold their property to a third party—despite State Farm having no duty to pay any loss of use benefits once Plaintiffs no longer owned the insured location.

Plaintiffs also sought benefits for the loss of personal property (sometimes referred to as a "contents claim"). As Plaintiffs submitted personal property information to State Farm, payments were issued. Additionally, within 27 days of receiving a usable comprehensive personal property inventory—which consisted of 564 individual line items that had to be reviewed, confirmed, and priced—State Farm issued an actual cash value payment of $53,447.20 for the remaining personal property items to Plaintiffs.

---

[1] Loss of use benefits include several types of payments, only one of which is at issue here: additional living expenses ("ALE"). *See* **Ex. 1**, Policy, at Mullican-SF_00024. The terms are sometimes used interchangeably to refer to the coverage and benefits at issue.

Midway through their insurance claim, Plaintiffs submitted information from a public adjuster, which State Farm timely considered and utilized to update its estimate and to issue a supplemental dwelling payment. But the public adjuster's exorbitant estimate did not change State Farm's evaluation that the policy's dwelling limit was not implicated at the actual cash value stage—as Plaintiffs' public adjuster contended. Additionally, for the reasons included in the *Daubert* motion being filed contemporaneously, the public adjuster's testimony is not reliable, and he should be excluded from offering any opinions in opposition to this motion or in support of Plaintiffs' case at trial (if any occurs).

Under the terms of their insurance policy, Plaintiffs were entitled to—and could have been paid—almost $90,000 additionally in withheld depreciation for dwelling and personal property benefits. This would have brought their totals received up to the replacement costs. But Plaintiffs never made any repairs to their home and never replaced any of their personal property. Instead, they chose to pocket the payments already made to them without performing the actions—repairing the home and replacing their personal items—for which those initial payments were issued.

All told, Plaintiffs are not due any additional amount on their contract claim. And State Farm promptly and appropriately responded to each submission of information or documents by Plaintiffs. There is no evidence of delay or inadequate investigation. Nor is there any evidence that something other than a legitimate insured-insurer dispute exists. That Plaintiffs do not agree with State Farm's decision does not mean that State Farm reached the wrong decision, and it certainly does not mean that State Farm acted unreasonably under the circumstances.

## STANDARD OF DECISION

Summary judgment should be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not "genuine" if the non-movant can do no more than "show that there is some metaphysical doubt as to the material facts." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006). Only facts that affect a substantive claim's disposition are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position [is] insufficient" to avoid summary judgment; "there must be evidence on which the [factfinder] could reasonably find for the [non-moving party]." *Id.* at 252. "[T]he summary judgment movant . . . need only point to a lack of evidence for the nonmovant on an essential element of the nonmovant's claim. The burden then shifts to the nonmovant to . . . set forth specific facts that would be admissible . . . from which a rational trier of fact could find for the nonmovant." *Emmanuel Baptist Church v. State Farm Fire & Cas. Co.*, No. CIV-11-594-D, 2012 WL 3595093, at *1 (W.D. Okla. Aug. 21, 2012) (cleaned up).

## UNDISPUTED MATERIAL FACTS[2]

### A.  Plaintiffs' insurance policy and the initiation of their insurance claim.

1.  State Farm issued a homeowners' policy (the "Policy"), No. 36-BA-T910-7, to Plaintiffs for the period of November 1, 2019, to November 1, 2020, for the residence premises of 6000 Country Ridge Lane in Newalla. **Ex. 1**, Policy, at Mullican-SF_00002.

---

[2] Abbreviated as "UMF." Green highlighting on exhibits is added for ease of reference. Where the Policy is quoted, emphasis showing defined terms has been omitted throughout.

2.     Any proof of loss must be submitted "within 60 days after the loss." *Id.* at Mullican-SF_00036.

3.     The Policy provides dwelling coverage ("Coverage A") "for accidental direct physical loss to the property . . . unless the loss is excluded or limited . . . ." *Id.* at Mullican-SF_00028. In issuing such payments, "the actual cash value of the damaged part of the property, up to the applicable limit of liability shown in the Declarations" is initially paid, followed by "the covered additional amount [the insured] actually and necessarily spend[s] to repair or replace the damaged part of the property" once "the repair or replacement is actually completed." *Id.* at Mullican-SF_00034. That is, initial payments are for actual cash value, with later payments bringing the total to the replacement cost (less any deductible).

4.     Dwelling payments are limited to actions "to repair or replace with similar construction . . . on the premises shown in the Declarations." *Id.*

5.     Personal property benefits also are paid at the "actual cash value of the damaged property" initially, with "the difference between the actual cash value and the cost [the insureds] have actually and necessarily spent to repair or replace the property"— i.e., replacement cost—paid once the replacement is complete. *Id.* at Mullican-SF_00035.

6.     To receive in excess of the actual cash value for personal property, the items must be "repaired or replaced within two years after the date of loss." *Id.*

7.     Loss of use benefits are available for "the reasonable and necessary increase in cost incurred by an insured to maintain their normal standard of living" when "a loss insured causes the residence premises to become uninhabitable." *Id.* at Mullican-SF_00024. Such benefits are limited to "the shortest of . . . the time required to repair or

5

replace the premises[ or] the time required for your household to settle elsewhere." *Id.*

8.     On October 15, 2020, Plaintiffs made an insurance claim for damage from a house fire which Mr. Mullican reported likely was a result of him leaving a candle burning unattended amidst ignitable fumes. *See* **Ex. 2**, Letter from State Farm to Stephen Mullican, at Mullican-SF_02010 to _02011; **Ex. 3**, File History,[3] at Mullican-SF_00127, _00129.

9.     A State Farm representative spoke with Plaintiffs the next day. *See* **Ex. 3**, File History, at Mullican-SF_00128 to _00129.

10.    The Oklahoma City Fire Department estimated the property loss value at $60,000 and the contents (i.e., personal property) loss value at $80,000. *See* **Ex. 4**, Fire Department Report, at SF-Mullican_02361.

**B.     Plaintiffs' claim for dwelling benefits.**

11.    On October 20, 2020—just five days after the loss—State Farm representative Hali Goss inspected Plaintiffs' property with Plaintiffs' chosen contractor—ServiceMaster, taking 196 photos in the process. *See* **Ex. 3**, File History, at Mullican-SF_00124 to _00125; **Ex. 5**, S. Mullican Dep. 60:9-20.

---

[3] In State Farm's internal notes in the File History, "PA" is public adjuster, "SFE" is State Farm estimate, "VM" is voicemail, "Covg A" is dwelling benefits, "Covg B" is personal property benefits, "Covg C" is loss of use benefits, "XM" is Xactimate (software used to develop repair and replacement estimates), "RCV" is replacement cost value, "ACV" is actual cash value, "TM" is team manager, "LM" is left message, "NI" is named insured (Mr. and Mrs. Mullican), "SM" or "CNSP" is ServiceMaster (Plaintiffs' contractor), "ALE" is assisted living expense, "XC" is Xactimate Contents, "SOL" is summary of loss, "LL" is large loss, "ext" is exterior, "ECS" is electronic claims system, and "O&C" is origin and cause.

12. Plaintiffs' contractor estimated that repairs would be complete in four-to-seven months. *See* **Ex. 3**, File History, at Mullican-SF_00118, _00125; **Ex. 5**, S. Mullican Dep. 89:17-90:13.

13. State Farm employed a specialist to investigate the origin and cause of the fire. *See* **Ex. 3**, File History, at Mullican-SF_00125.

14. The origin and cause specialist issued his report on November 3, 2020, after it being delayed due to a loss of power at the laboratory analyzing samples due to the October 2020 ice storm in Oklahoma City. **Ex. 3**, File History, at Mullican-SF_00121; **Ex. 6**, Scott Report, at Mullican-SF_05026 to _05027.

15. The fire's cause was "undetermined"—possibly being "an intentional act of a person[]" and possibly being inadvertence. **Ex. 6**, Scott Report, at Mullican-SF_05027.

16. Based on her inspection, and working with Plaintiffs' contractor, State Farm representative Hali Goss constructed a repair estimate with an actual cash value of $133,002.73 and a replacement cost of $190,758.36. *See* **Ex. 3**, File History, at Mullican-SF_00113; *id.* at _0119 (indicating that an initial estimate draft was submitted by "CNSP"—i.e., Plaintiffs' contractor—which was then altered by Ms. Goss to reach State Farm's approved version); **Ex. 7**, State Farm Estimate, at Mullican-SF_00697.

17. On November 13, 2020—just 10 days after receiving the specialist's report—State Farm issued a dwelling payment to Plaintiffs for $133,002.73: the actual cash value calculated for necessary repairs to Plaintiffs' home. *See* **Ex. 3**, File History, at Mullican-SF_00113; **Ex. 8**, Payments Log, at Mullican-SF_00075. Due to the accidental non-inclusion of a lienholder on the payment, it was re-issued on November 20, 2020. *See* **Ex. 8**,

Payments Log, at Mullican-SF_00075.

18.    Almost three months later, on February 9, 2021, State Farm learned that Plaintiffs had not begun repairs and they had parted ways with their contractor, despite the actual cash value payment for the dwelling having been made, at the recommendation of their newly-retained public adjuster. *See* **Ex. 3**, File History, at Mullican-SF_00101.

19.    On February 13, 2021, Plaintiffs' public adjuster submitted a proof-of-loss packet including, among other items, a dwelling repair estimate with a replacement cost value of $295,044.22. *See* **Ex. 9**, Ian's Estimate, at SF-Mullican_02519. Because the public adjuster's estimate exceeded the unadjusted limit in the Policy by more than $50,000, the public adjuster sought payment of just $180,100.00 in dwelling benefits. *See id.*; **Ex. 1**, Policy, at Mullican-SF_00003.

20.    The "net claim" amount sought by Plaintiffs ($180,100.00) was less than the replacement cost value of $190,758.36 previously calculated by State Farm (not accounting for the deductible). *See* **Ex. 7**, State Farm Estimate, at Mullican-SF_00697.

21.    State Farm representative Hali Goss reviewed and considered the differences between the public adjuster's proposed estimate and the amount she previously had determined to be necessary for repair of Plaintiffs' dwelling. *See* **Ex. 3**, File History, at Mullican-SF_00092 to _00094; **Ex. 10**, Goss Reconciliation Notes, at Mullican-SF_01129 to _01139. And, accordingly, she updated State Farm's estimate to, e.g., increase the number of dumpster loads from three to four, increase the time for temporary power and a temporary toilet from four months to six months, update the cost for removing and replacing a breaker panel with 150 amp to the cost for removing and replacing a breaker

panel with 200 amp, add installation of a new furnace (not originally believed to be necessary), and change the pantry flooring from carpet to tile. *See* **Ex. 11**, Updated Estimate, at Mullican-SF_03027 to _03075. The revised replacement cost was $202,256.90 and the revised actual cash value was $140,301.82. *Id.* at SF-Mullican_03028.[4]

22.     On May 6, 2021, State Farm issued a dwelling payment for $7,299.09 for the difference between the original and the revised actual cash values. *See* **Ex. 8**, Payments Log, at Mullican-SF_00075; **Ex. 12**, Summary of Loss (Apr. 16, 2021), at Mullican-SF_00646 to _00647. *Compare* **Ex. 7**, State Farm Estimate, at Mullican-SF_00697 ($133,002.73), *with* **Ex. 11**, Updated Estimate, at Mullican-SF_03028 ($140,301.82).

23.     State Farm also agreed, once repairs were completed, it would make replacement cost payments (up to the policy limit) based on a more recent price list—to account for rising costs instead of sticking with the price list originally applied (from October 2020). *See* **Ex. 3**, File History, at Mullican-SF_00092.[5]

24.     On June 17, 2021, Plaintiffs submitted an engineering report from Valor Forensic Engineering making various recommendations for the repair of Plaintiffs' home (which, at this point, they no longer owned; *see* UMF No. 44). *See* **Ex. 13**, Email from

---

[4] The $202,256.90 estimate (utilizing an October 2020 price list) is marked as a "draft" because it was completed during the same time frame as completion of a $211,856.54 estimate (utilizing an April 2021 price list), with the latter being expected to be used to make a final payment after repairs were completed. *See* UMF No. 23.

[5] This did not result in an immediate additional payment because actual cash value—the only amount due until repairs are complete—is determined from the prices in effect on the date of loss. *See* **Ex. 1**, Policy, at Mullican-SF_00017.

Rupert to State Farm (June 17, 2021), at Mullican-SF_02244 to _02355.

25.     State Farm representative Hali Goss considered the conclusions reached by Valor Forensic and determined that each of them already was included in the scope of repairs estimated for by State Farm or was not covered by the Policy. *See* **Ex. 3**, File History, at Mullican-SF_00083. Ms. Goss then communicated to Plaintiffs' public adjuster that State Farm was standing on its existing decision and responding to the public adjuster's other complaints. *See* **Ex. 14**, Letter from State Farm to Rupert (June 28, 2021), at Mullican-SF_00509.

26.     Prior to selling their home in May 2021, neither Plaintiffs nor any contractor retained by them completed any estimated-for repairs to the home beyond initial mitigation work performed by Plaintiffs' contractor, for which no depreciation was withheld by State Farm. *See* **Ex. 5**, S. Mullican Dep. 62:14-22; **Ex. 15**, ServiceMaster Invoice, at Mullican-SF_01810 to _01812; **Ex. 8**, Payments Log, at Mullican-SF_00075.

**C.     Plaintiffs' claim for personal property benefits.**

27.     On October 16, 2020—the day following Plaintiffs' loss—State Farm issued an advance payment for the loss of personal property to Plaintiffs. *See* **Ex. 3**, File History, at Mullican-SF_00129; **Ex. 8**, Payments Log, at Mullican-SF_00075.

28.     Plaintiffs submitted information regarding lost personal property from their laundry room on October 27, 2020. **Ex. 3**, File History, at Mullican-SF_00122; **Ex. 16**, First Loss Inventory, at Mullican-SF_05225 to _05227.

29.     Plaintiffs submitted information regarding lost personal property from their master bathroom and bedroom on November 3, 2020. **Ex. 3**, File History, at Mullican-

SF_00120; **Ex. 17**, Second Loss Inventory, at Mullican-SF_05222 to _05224.

30.     On November 4, 2020—eight days after receiving laundry room information and one days after receiving the remaining information—State Farm issued a personal property payment to Plaintiffs for $1,333.02. *See* **Ex. 8**, Payments Log, at Mullican-SF_00075; **Ex. 18**, Payment Worksheet (Nov. 4, 2020), at Mullican-SF_04285 to _04290.

31.     Plaintiffs submitted information regarding lost electronics/appliances on November 6, 2020. *See* **Ex. 19**, Third Loss Inventory, at Mullican-SF_05219 to _05221.

32.     On November 30, 2020, State Farm issued a personal property payment to Plaintiffs for $3,606.58 for electronics and appliances after verifying their costs. *See* **Ex. 3**, File History, at Mullican-SF_00110 (verifying the submitted items); **Ex. 8**, Payments Log, at Mullican-SF_00075; **Ex. 20**, Payment Worksheet, at Mullican-SF_00683 to _00688.

33.     On February 13, 2021, Plaintiffs' public adjuster submitted a proof-of-loss packet including a comprehensive list of lost personal property items with an actual cash value of $92,760.15. *See* **Ex. 9**, Ian's Estimate, at SF-Mullican_02463 to _02516, _02521.

34.     On February 18, 2021, State Farm requested that the public adjuster submit the personal property information via a spreadsheet instead of in PDF. *See* **Ex. 3**, File History, at Mullican-SF_00099. The public adjuster provided a spreadsheet on March 2, 2021, listing every single item as being in "new," "above average," or "average" condition, with none being "below average." **Ex. 21**, Email from Rupert to State Farm, at Mullican-SF_01831 to _01850.

35.     Just 28 days after being provided the 564-item inventory in a usable format, State Farm issued a personal property payment to Plaintiffs for $53,447.20. *See* **Ex. 8**,

Payments Log, at Mullican-SF_00075; **Ex. 22**, State Farm Contents Summary, at Mullican-SF_03944 to _03967 (showing an ACV of $59,886.80 which sums to the amount paid of $53,447.20 when previously-paid personal property amounts are subtracted).

36.     State Farm's replacement cost total for personal property was almost $8,000 more than the replacement cost calculated by Plaintiffs' public adjuster originally, and almost $15,000 more than the replacement cost submitted by Plaintiffs' public adjuster via spreadsheet. *Compare* **Ex. 22**, State Farm Contents Summary, at Mullican-SF_03946 ($100,353.56), *with* **Ex. 9**, Ian's Estimate, at SF-Mullican_02521 ($92,760.15), *and* **Ex. 21**, Email from Rupert to State Farm, at Mullican-SF_01833 ($85,513.60).

37.     Plaintiffs have not provided State Farm receipts for any purchases of their lost personal property, despite being provided a way to do so. **Ex. 5**, S. Mullican Dep. 167:18-169:7, 87:1-8; **Ex. 23**, Email from State Farm to Plaintiff, at Mullican-SF_00660.

**D.      Plaintiffs' claim for loss of use benefits.**

38.     Plaintiffs originally did not request payment for lodging. *See* **Ex. 3**, File History, at Mullican-SF_00129; **Ex. 5**, S. Mullican Dep. 84:4-9.

39.     Plaintiffs first requested payments for temporary living accommodations on November 3, 2020, and State Farm authorized a 10-day stay on the same day. *See* **Ex. 3**, File History, at Mullican-SF_00120; **Ex. 5**, S. Mullican Dep. 93:23-95:3.

40.     On November 5, 2020—two days after Plaintiffs requested housing—State Farm approved lodging for five months. *See* **Ex. 3**, File History, at Mullican-SF _00118; *see also id.* at Mullican-SF_00101 (reiterating approval for lodging to April 16, 2021).

41.     Payments for loss of use benefits for their lodging were issued for Plaintiffs

on December 1, 2020 ($5,741.72, for the period of October 16, 2020 to January 31, 2021);

on January 13, 2021 ($1,625.00, for the period of February 1, 2001 to February 28, 2001);

on March 17, 2021 ($812.55, for the period of March 1, 2021 to March 15, 2021); and,

again, on March 17, 2021 ($1,679.17, for the period of March 16, 2021 to April 16, 2021).

*See* **Ex. 8**, Payments Log, at Mullican-SF_00075; **Ex. 24**, Temporary Accommodations

Invoices, at Mullican-SF_01853, _01856, _01862, _01882.

42.     On May 6, 2021, a final payment of $5,850.00 for loss of use benefits was

issued to Plaintiffs. *See* **Ex. 8**, Payments Log, at Mullican-SF_00075. This was a so-called

final "cash-out" payment. *See* **Ex. 3**, File History, at Mullican-SF_00089.

43.     At the monthly rate being paid for Plaintiffs' lodging ($1,625.00, inclusive

of a management fee; *see* **Ex. 24**, at Mullican-SF_01882), this "cash out" payment would

have allowed Plaintiffs to have paid-for alternative housing for more than three additional

months. *See* **Ex. 5**, S. Mullican Dep. 175:20-176:6.[6]

44.     On May 7, 2021, Plaintiffs sold the insured premises. *See* **Ex. 25**, Letter from

Rupert to State Farm (May 28, 2021), at Mullican-SF_01106 to _01107.

**E.     Plaintiffs' admitted litigation positions.**

45.     Plaintiffs have only identified three complaints that they, themselves, have

with regard to State Farm's handling of their insurance claim: (i) that depreciation was

---

[6] Even at the higher rate for a rental proposed by the public adjuster ($1,495 per month in rent, plus $1,750.30 per month for furniture), this "cash amount" would have been enough for nearly two months of additional lodging—taking Plaintiffs well past the date on which they sold their property. *See* **Ex. 9**, Ian's Estimate, at SF-Mullican_02516 to _02517.

withheld from the amounts paid to them (with regard to both dwelling benefits and personal property benefits), (ii) that State Farm did not pay them for alternative lodging in May 2021 and onward, and (iii) that Ms. Goss did not, in their view, adequately reconcile her estimate for State Farm with the estimate submitted by Plaintiffs' public adjuster. *See* **Ex. 5**, S. Mullican Dep. 98:5-99:5, 159:25:1-167:17, 201:12-20, 204:13-212:6; **Ex. 25**, K. Mullican Dep. 8:12-10:22, 95:2-97:22, 105:22-111:17.

46.     Paying depreciation in the first instance instead of withholding it would have meant that State Farm was "act[ing] in a way different than what's in the insurance policy contract between [Plaintiffs] and State Farm." **Ex. 5**, S. Mullican Dep.163:20-164:5.

## ARGUMENTS AND AUTHORITIES

### I.     Plaintiffs lacks any evidence in support of their contract claim.

To prevail on their breach of contract claim, Plaintiffs must establish the formation of a contract (which State Farm concedes for the purpose of this motion), a breach, and damages as a direct result. *See Bayro v. State Farm Fire & Cas. Co.*, No. CIV-14-1084-D, 2015 WL 4717166, at *1 (W.D. Okla. Aug. 7, 2015). Plaintiffs bear the burden of proving their damages. *See Shelton v. Sha Ent, LLC*, No. CIV-20-644-D, 2021 WL 1407968, at *1 (W.D. Okla. Apr. 14, 2021). And alleged contractual damages must be "clearly ascertainable in both their nature and origin." Okla. Stat. tit. 23, § 21. Further, to be recoverable, damages must be susceptible of ascertainment "in some manner other than by mere speculation, conjecture or surmise, and by reference to some definite standard." *Great W. Motor Lines, Inc. v. Cozard*, 417 P.2d 575, 578 (Okla. 1966).

Here, Plaintiffs cannot establish any breach of the insurance contract. Turning ***first***

to Plaintiffs' allegations regarding loss of use damages, it is clear that nothing more was owed. Plaintiffs sought funds for alternative living arrangements on November 3, 2020, and State Farm authorized a 10-day stay on the same day. *See* UMF Nos. 38-39. Thereafter, State Farm issued payments for Plaintiffs to live at a location other than their home— purportedly while the insured premises was undergoing repairs—for the period of October 16, 2020 through April 16, 2021. *See* UMF Nos. 40-41. That is, Plaintiffs had housing provided for them by Temporary Accommodations (a third-party vendor utilized by State Farm) up to a point six months after the date of loss. *See* UMF Nos. 8, 40-41. Additionally, State Farm issued Plaintiffs additional loss of use benefits of $5,850, which would have provided housing to Plaintiffs for a conservatively-calculated additional three months— i.e., through mid-July 2021. *See* UMF Nos. 42-43. All told, Plaintiffs had funds for housing up to nine months after the fire occurred.

This is well beyond the repair time which Plaintiffs' contractor estimated for—at least if Plaintiffs had begun work when they were issued an actual cash value payment by State Farm in mid-November 2020. *See* UMF Nos. 16-17. Had Plaintiffs begun construction at that point, they would have been able to move back into their home in mid-June 2021 even if a supplemental dwelling payment had to be issued—and that is if the time for construction reached the maximum range estimated. *See* UMF No. 12. Their home could have been ready as early as March 2020. *See id.*; *see also* **Ex. 5**, S. Mullican Dep. 89:17-90:13 (indicating that Plaintiffs' contractor gave Mr. Mullican the same four-to-seven-month estimated time frame for repairs); *id.* at 110:23-111:3 (agreeing that repairs could have been completed by mid-April 2021 if begun in November 2020); *id.* at 123:10-

23. But Plaintiffs never authorized their chosen (and later fired) contractor to begin repairs; nor did they ever actually complete any repairs to the insured premises. *See* UMF No. 23.

The Policy only requires, as relevant here, payment of additional living expense benefits for a limited time: "the shortest of . . . the time required to repair or replace the premises[ or] the time required for your household to settle elsewhere." **Ex. 1**, Policy, at Mullican-SF_00024. Here, Plaintiffs have admitted that the time required to repair the premises, had they actually begun, went no later than June 2021, and possibly was as early as March 2021. By paying through at least mid-July 2021, State Farm's payments exceeded what was required. *See* UMF Nos. 39-43.

Additionally, Plaintiffs have admitted that they "settle[d] elsewhere"—at property they already owned in Shawnee—no later than April 2021. *See* **Ex. 5**, S. Mullican Dep. 139:13-22; *see also id.* at 46:20-21 (indicating that Plaintiffs had intended to retire to Shawnee). Thus, by this measure as well, State Farm's payments exceeded what was required and no additional amount was owed to Plaintiffs. *See* UMF Nos. 39-43.

Moreover, Plaintiffs sold the insured premises—referred to in the Policy as the "residence premises"—on May 7, 2021. *See* UMF No. 44. And additional living expense funds are limited to circumstances during which "the residence premises . . . become[s] uninhabitable" as a result of "a loss insured." **Ex. 1**, Policy, at Mullican-SF_00024. Uninhabitability existed due to the fire *prior* to Plaintiffs' sale of their home. But, *after* May 7, 2021, it was not a "loss insured"—i.e., the fire—that prohibited Plaintiffs from inhabiting the insured location. *Id.* It was, instead, that they no longer had any ownership interest in or right to the premises—because of the sale. *See* UMF No. 44. Indeed, had

Plaintiffs attempted to inhabit their previously-owned home after selling it, they would have been trespassing. Still, State Farm paid adequate funds to Plaintiffs for alternative housing through and past the sale. *See* UMF Nos. 39-43. All amounts owed to Plaintiffs under Coverage C for loss of use were paid and no breach of contract exists.

***Second***, Plaintiffs complain that State Farm withheld depreciation from their payments. To be clear, Plaintiffs' complaint is *not* how State Farm calculated depreciation. Instead, their argument is that no depreciation should have been withheld *at all*:

> Q    Other than the fact that depreciation was withheld, you don't have any problems with how depreciation was calculated; correct?
>
> A    No.
>
> Q    Okay. You're not saying that, for example, something was depreciated by $200 and it should have been depreciated by $100? It's just the fact that depreciation was withheld that's your complaint; correct?
>
> A    Yes.

**Ex. 5**, S. Mullican Dep. 167:8-17; *see also id.* at 160:3-17, 162:6-164:5, 201:12-20.

But State Farm clearly is allowed to withhold depreciation and make initial payments for only the actual cash value for repairs or replacements under the Policy:

**COVERAGE A – DWELLING**

1.    **A1 – Replacement Cost Loss Settlement – Similar Construction.**

> a.    ***We*** will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the ***Declarations***, the damaged part of the property covered under **SECTION I – PROPERTY COVERAGES, COVERAGE A – DWELLING**, except for wood fences, subject to the following:
>
> > (1)    until actual repair or replacement is completed, ***we*** will pay only the ***actual cash value*** of the damaged part of the

property, up to the applicable limit of liability shown in the ***Declarations***, not to exceed the cost to repair or replace the damaged part of the property;

(2)     when the repair or replacement is actually completed, ***we*** will pay the covered additional amount ***you*** actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the ***Declarations***, whichever is less;

(3)     to receive any additional payments on a replacement cost basis, ***you*** must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify ***us*** within 30 days after the work has been completed; and

(4) ***we*** will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair, or demolition of a ***building structure*** or other structure, except as provided under **OPTIONAL POLICY PROVISIONS**, **Option OL – Building Ordinance or Law**.

**Ex. 1**, Policy, at Mullican-SF_00034;[7] *see also id.* at Mullican-SF_00017 (defining "actual cash value" as "the value of the damaged part of the property at the time of loss, . . . less a deduction to account for pre-loss depreciation"). And because Plaintiffs never made any repairs to the insured location (*see* UMF No. 26)—to say having done so within two years of the loss—they were never due depreciation under their Coverage A dwelling claim. *See id.* (limiting payment to "similar construction . . . on the premises shown in the

---

[7] The section titled "A1 – Replacement Cost Loss Settlement – Similar Construction" applies, not the following section titled "A2." *See* **Ex. 1**, Policy, at Mullican-SF_00034 ("Only the Loss Settlement Provisions shown in the Declarations apply."); *id.* at Mullican-SF_00003 (stating the in-effect version is "A1 Replacement Cost – Similar Construction").

Declarations"); *see also* **Ex. 5**, S. Mullican Dep. 179:1-13.

Likewise, State Farm was unequivocally allowed to withhold depreciation and pay only the actual cash value for personal property:

> **COVERAGE B – PERSONAL PROPERTY**
> 1.   **B1 – Limited Replacement Cost Loss Settlement.**
>
> > a.   *We* will pay the cost to repair or replace property covered under **SECTION I – PROPERTY COVERAGES**, **COVERAGE B – PERSONAL PROPERTY**, except for property listed in item below, subject to the following:
> >
> > > (1)   until repair or replacement is completed, *we* will pay only the *actual cash value* of the damaged property;
> > > (2)   after repair or replacement is completed, *we* will pay the difference between the *actual cash value* and the cost *you* have actually and necessarily spent to repair or replace the property; and
> > >
> > > (3)   if property is not repaired or replaced within two years after the date of loss, *we* will pay only the *actual cash value*.

**Ex. 1**, Policy, at Mullican-SF_00035. Again, Plaintiffs never provided any evidence that they purchased any replacement personal property, and certainly did not do so within two years of the loss. *See* UMF No. 37. So, Plaintiffs never were owed payment of depreciated amounts under the Coverage B personal property claim.

While Plaintiffs may disagree with the structure of the Policy and how actual cash value and replacement costs are paid, that does not allow them to rewrite Policy terms. And the Court may not enforce different terms that those agreed to by the parties. *See Miller v. CSAA Gen. Ins. Co.*, 609 F. Supp. 3d 1226, 1230 (N.D. Okla. 2022) ("Under Oklahoma law, an insurance contract should be construed according to the terms set out within the

four corners of the document. If the terms of the contract are unambiguous, clear and consistent, they are to be accepted in their ordinary sense and enforced to carry out the expressed intention of the parties." (cleaned up)); *Curtis v. Progressive N. Ins. Co.*, No. CIV-17-1076-PRW, 2022 WL 109003, at *5 (W.D. Okla. Jan. 11, 2022) ("Courts apply the contract as written and do not rewrite an insurance contract to benefit either party." (quotation marks omitted)). As stated by the Oklahoma Supreme Court, "[p]arties to [an] insurance contract are at liberty to contract for insurance to cover such risks as they see fit and are bound by the terms of contract and courts will not undertake to rewrite terms thereof." *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991) (quotation marks and citation omitted). This Court should enforce the Policy as written.

Plaintiffs have not identified any other bases for their contract claim. *See* **Ex. 5**, S. Mullican Dep. 219:17-21. Accordingly, judgment for State Farm is proper.

## II.     Plaintiffs' bad faith claim cannot survive.

To establish a claim for bad faith, Plaintiffs must establish four elements:

1) the claimant was entitled to coverage under the insurance policy at issue;
2) the insurer had no reasonable basis for delaying or denying payment;
3) the insurer did not deal fairly and in good faith with the claimant; [and]
4) the insurer's violation of the duty of good faith and fair dealing was the direct cause of the injury sustained by the claimant.

*Emmanuel Baptist Church*, 2012 WL 3595093, at *7. "The absence of any one of these elements defeats a bad faith claim." *Ball v. Wilshire Ins. Co.*, 2009 OK 38, ¶ 21, 221 P.3d 717, 724. Here, Plaintiffs cannot establish any of these elements.

a.   **Plaintiffs' bad faith claim fails because there is no breach of contract.**

Initially, Plaintiffs' bad faith claim fails because they cannot identify any payment owed to them which was "delay[ed] or den[ied]." *Emmanuel Baptist Church*, 2012 WL 3595093, at *7. Plaintiffs have identified just two bases for the alleged breach of contract by State Farm: that actual cash value was paid instead of replacement cost and that loss of use benefits were not paid for a longer time, including after they sold their home. *See supra*. But, as shown, neither of these arguments is supported by the Policy. Thus, Plaintiffs' bad faith claim fails without need for further analysis. As stated recently by Judge Wyrick:

> [A] plaintiff must establish a breach of the underlying contract in order to maintain a bad faith claim, since a determination of liability under the contract is a prerequisite to a recovery for a bad faith breach of an insurance contract. Accordingly, since [Plaintiffs] failed to establish that [State Farm] breached the insurance contract, [State Farm] is entitled to summary judgment on the bad faith claim.

*Curtis*, 2022 WL 109003, at *6 (cleaned up). This Court should find the same.

b.   **Alternatively, Plaintiffs' bad faith claim fails under the burden-shifting framework.**

Even if additional analysis of Plaintiffs' bad faith claim is required, Plaintiffs have not shown any action sufficient for their bad faith claim to reach a jury. In evaluating a summary judgment motion, a two-step inquiry may be employed. First, a court can "consider[] whether there is a legitimate dispute between the insurer and the insured regarding coverage or the value of the claim." *Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1315 (10th Cir. 2019). "[W]here there is a legitimate dispute between the parties,

then as a matter of law, no reasonable inference of bad faith arises." *Id.* (cleaned up). Therefore, "[b]ecause the denial of a claim based upon a legitimate dispute does not imply bad faith as a matter of law, judgment as a matter of law is to be granted to the insurer unless the insured produces specific evidence of bad faith." *Id.* (cleaned up). The second analytical step asks whether an insured has "offered specific additional evidence"—e.g., "evidence that the insurer did not actually rely on the legitimate dispute to deny coverage, denied the claim for an illegitimate reason, . . . failed to treat the insured fairly, . . . [or] performed an inadequate investigation of the claim"—"to demonstrate bad faith." *Id.* (cleaned up). Only when a "plaintiff has offered sufficient evidence to show the insurer acted in bad faith, [may] the [C]ourt . . . send the [claim] to a jury." *Id.* (citations omitted).

Importantly, "there can be disagreements between insurer and insured on a variety of matters such as insurable interest, extent of coverage, cause of loss, [or] amount of loss" without any bad faith. *Christian v. Am. Home Assurance Co.*, 577 P.2d 899, 905 (Okla. 1977). When disputes exist, an insurer is not "prevent[ed] . . . from reasonably withholding payment or litigating a legitimate dispute." *Porter v. Okla. Farm Bureau Mut. Ins. Co.*, 2014 OK 50, ¶ 22, 330 P.3d 511, 518. The operative "question is whether the insurer had a good faith belief, *at the time its performance was requested,* that it had a justifiable reason for withholding payment under the policy." *Id.* ¶ 23, 330 P.3d at 518 (cleaned up).

Here, there is no evidence of anything other than a legitimate dispute between Plaintiffs and State Farm regarding the extent of fire-caused damage to their home. State Farm initially determined that the cost to repair the fire-caused damage was $190,758.36, and it issued an actual cash value payment accordingly. *See* UMF Nos. 16-17. Later, upon

receiving additional information from Plaintiffs via their public adjuster, State Farm increased its estimated replacement cost to $202,256.90 (before accounting for the policy's dwelling limit). *See* UMF No. 21. State Farm's determinations were supported by an on-site inspection conducted within days of Plaintiffs submitting their insurance claim, as well as consideration of all materials submitted by Plaintiffs and their public adjuster. *See* UMF Nos. 21-25. While State Farm did not ultimately agree with the estimate prepared by the public adjuster, Plaintiffs have not offered any evidence that it was not considered. And Ms. Mullican's speculation that Ms. Goss's reconciliation of the State Farm estimate with the public adjuster's estimate is inadequate for bad faith. *See* K. Mullican Dep. 96:24-97:17; *cf. Hellard v. Mid Century Ins. Co.*, No. 19-CV-43-GKF-CDL, 2021 WL 429917, at *4 (N.D. Okla. Feb. 8, 2021) (excluding speculation about an insurer's actions).

Ms. Goss conducted a line-by-line review of the public adjuster's estimate and updated State Farm's estimate as appropriate. *See* UMF No. 21. This review easily meets the standard of reasonableness applied to a bad faith claim. *See Harris v. Progressive Direct Ins. Co.*, No. CIV-15-1252-HE, 2016 WL 9022439, at *3 (W.D. Okla. Sept. 14, 2016) ("[N]othing in the law requires an insurer to investigate a claim exhaustively or to a faultless degree of accuracy. Rather, the investigation only needs to be reasonable under the circumstances." (quotation marks and citation omitted)); *Cordis v. State Farm Mut. Auto. Ins. Co.*, No. CIV-21-873-D, 2022 WL 4543223, at *4 (W.D. Okla. Sept. 28, 2022) ("[T]he insurer's duty to investigate is not unlimited.").

The same is true for the engineer report received from Valor Forensic Engineering. *See* UMF Nos. 21-25. In fact, Mrs. Mullican stated that she "assume[d] that [Ms. Goss] . . .

received the engineering report . . . , she . . . reviewed it and then she compared [the engineer's] findings to the finding that were in the State Farm estimate." **Ex. 26**, K. Mullican Dep. 94:21-95:1. And Mr. Mullican indicated that he held a similar view of the adequacy of Ms. Goss's review of the engineering report. *See* **Ex. 5**, S. Mullican Dep. 183:5-194:1. Ms. Goss's notes about the engineer report show as much. *See* UMF No. 25.

Further, the mere existence of a dispute regarding the scope of covered damages between Plaintiffs and State Farm is not a sufficient basis to allow Plaintiffs' bad faith claim to proceed to trial. As the Tenth Circuit has succinctly stated, "the denial of a claim based upon a legitimate dispute does not imply bad faith." *Oulds v Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1442 (10th Cir. 1993). And, in similar circumstances, Judge DeGiusti previously has determined a legitimate dispute to exist which made summary judgment for the insurer appropriate.

In *Unterkircher v. State Farm Fire & Casualty Co.*, the court granted summary judgment on a bad faith claim when the insurer and the insured's public adjuster disagreed regarding whether storm-caused damage existed when the insurer's inspector had taken approximately 92 photos during his inspection and a request for a second inspection was rejected by the insurer. *See* No. CIV-21-897-D, 2022 WL 16936039, at *4 (W.D. Okla. Nov. 14, 2022). Indeed, like in *Unterkircher*, there is evidence here that State Farm's representative reviewed and considered information submitted by Plaintiffs and their public adjuster, but the insurer reached a different result in its analysis of the scope of fire-caused damage than that reached by Plaintiffs' representatives. *Compare Unterkircher*, 2022 WL 16936039, at *4 (relying on a claim specialist's notation that "photos/file notes

in claim support overall claims decision and photos do not illustrate new information that warrants a 2nd inspection" and a team manager's notation that "[t]he photos of the shingles do not illustrate hail damage" and instead "[t]he damage appears to be wear/tear and granule loss" (cleaned up)), *with* UMF Nos. 11-25.

Finally, the mere fact of multiple payments is not evidence of bad faith. *See Emmanuel Baptist Church*, 2012 WL 3595093, at *6-7 (granting summary judgment to an insurer when payment was made based on an initial estimate, then a supplemental payment was issued based on a revised estimate after additional information was received from the insured). Indeed, this insurance claim shows what is supposed to happen when an insured provides additional information to an insurer: State Farm considered the information and, to the extent it agreed with Plaintiffs' positions, it issued an additional payment.

Because there is, at least, a legitimate dispute regarding coverage for those alleged damage which were not included in State Farm's estimates, Plaintiffs are required to produce "specific evidence of bad faith"—e.g., "evidence that the insurer did not actually rely on the legitimate dispute to deny coverage, [that the insurer] denied the claim for an illegitimate reason, . . . [that the insurer] failed to treat the insured fairly, . . . [or that the insurer] performed an inadequate investigation of the claim." *Shotts*, 943 F.3d at 1315 (cleaned up) (emphasis omitted). Plaintiffs must offer more than conclusory, bare-bones assertions without specific evidence to avoid summary judgment. *See id.* at 1317 (rejecting assertions that an insurer "biasedly refused to consider and evaluate all of [the insured's] permanent lifetime injuries; intentionally placed an unreasonably low dollar evaluation on the claim; and unfairly looked for ways to reduce, delay, or deny [the insured's] claim" as

sufficient when the insured did not "offer specific evidence to support these bare allegations" (cleaned up)).

Here, Plaintiffs have no such evidence. There were no significant State-Farm-caused delays in the handling of Plaintiffs' insurance claim. An inspection occurred within five days of Plaintiffs submitting their claim, and payment on their dwelling claim was issued just 24 days later—despite a closed laboratory due to an ice storm, the delays which were inherent in all aspects of life during the COVID-19 pandemic in October 2020, and the extensive nature of the estimate which had to be developed, consisting of more than 550 individual line items. *See* UMF Nos. 8, 11-17. Upon Plaintiffs submitting a request for loss of use benefits, authorization was given the same day. A personal property advance payment was issued within a day of the insurance claim being made, and the first two personal property payments were made within one, eight, and twenty-four days of the three submissions on which they were based, respectively.

Upon Plaintiffs' public adjuster becoming involved and submitting a proof of loss, a comprehensive personal property payment was made in 46 days, and a supplemental dwelling payment followed just 37 days later. Those payments required investigation and analysis of more than 550 different line items per type of coverage each, as well as waiting for resubmission of some information from the public adjuster in a usable format. *See* UMF Nos. 19, 21-22, 33-35. Such relatively quick analyses and responses are especially notable because State Farm was not required to consider the proof of loss submitted nearly four months after the date of loss at all. *See* UMF No. 7. That State Farm did so and issued payments anyway is a sign of its good-faith claim-handling, not of bad-faith actions.

Nor is there any evidence of inadequate investigation. To successfully provide specific evidence of bad faith via an inadequate-investigation theory, an insured must "provide evidence to show that [the insurer's claim handler] did not . . . investigate[] and evaluate[ identified] facts . . . during [his or] her investigation." *Shotts*, 943 F.3d at 1318 (cleaned up). Moreover, "[u]nder Oklahoma law, an insurer's investigation need only be reasonable, not perfect." *Id.* (cleaned up).

Here, as explained *supra*, State Farm performed an in-person inspection, considered additional information received from Plaintiffs' public adjuster and engineer, and analyzed and reconciled each bit of information submitted. State Farm representative Hali Goss's inspection included all areas of the property, as she had 196 photos of the property, running the gamut of locations with alleged damages. *See* UMF No. 5. While such an investigation should not be considered inadequate *at all*; certainly, it cannot be considered *so inadequate* as to fall below the threshold of "reasonable under the circumstances." *Harris*, 2016 WL 9022439, at *3 (quotation marks and citation omitted).

Finally, Plaintiffs have not identified anything else to push this insurance claim into the realm of viable bad faith. And "[t]he mere fact that [State Farm] did not pay plaintiff[s] the full amount that [they] sought is not enough to show an unreasonable act under Oklahoma law." *Evans v. Liberty Nat'l Life Ins. Co.*, No. 13-CV-390-CVE-PJC, 2015 WL 1650192, at *8 (N.D. Okla. Apr. 14, 2015). Federal courts in Oklahoma have been consistent in recognizing the principle that a difference in opinion regarding the amount to be paid for allegedly-covered damages, without something more, is not evidence of an inadequate investigation or of bad faith generally—even if the difference is large. The

plaintiff in *Choctaw Express Mart, Inc. v. Employers Mutual Casualty Co.* argued that "clearly an underpayment of the magnitude of $512,036.89 is enough to bring a bad faith action." No. CIV-14-1227-HE, 2015 WL 1014774, at *2 (W.D. Okla. Mar. 9, 2015). But Judge Heaton directly rejected that assertion. *See id.*; *see also Rivera v. Hartford Ins. Co. of the Midwest*, No. CIV-14-1082-HE, 2015 WL 1014633, at *1 (W.D. Okla. Mar. 9, 2015) (same). In other words, that Plaintiffs' public adjuster provided an estimate for repairs which is somewhat higher than the amount determined to be required for repairs by State Farm does not support a bad faith claim. "[A] disagreement as to the extent or cause of damage between Defendant[] . . . and Plaintiff's roofer and expert"—or, here, Plaintiffs' public adjuster—"is not enough to sustain a bad faith claim." *Hartsfield v. Farmers Ins. Co.*, No. CIV-10-585-C, 2011 WL 2680840, at *4 (W.D. Okla. July 8, 2011).

If anything, this insurance claim includes acts of good faith by State Farm. With regard to dwelling and personal property benefits, State Farm considered Plaintiffs' proof of loss which was not timely submitted. *See* UMF Nos. 2, 32. And with regard to personal property benefits, State Farm actually calculated a higher replacement cost for the lost items submitted by Plaintiffs than the amounts proposed by Plaintiffs' public adjuster. *See* UMF No. 35. All told, Plaintiffs simply lack any factual basis for a bad faith claim and likewise have no viable legal argument in support of their claim.

## III.    Plaintiffs cannot recover punitive damages.

Plaintiffs assert they are entitled to punitive damages. *See* Pet. ¶ 44, ECF No. 1-1. However, because Plaintiffs' claim for bad faith fails, their request for punitive damages also fails. Both statute and caselaw are clear: "Punitive damages are not recoverable for a

breach of contract." *Cimarex Energy Co. v. Calhoon*, Nos. CIV-11-525, CIV-11-725-D, 2012 WL 1371386, at *5 (W.D. Okla. Apr. 19, 2012); *see also* Okla. Stat. tit. 23, § 9.1 ("In an action for the breach of an obligation not arising from contract. . . .").

Here, a jury may award punitive damages only if it finds, "by clear and convincing evidence, that [State Farm] has recklessly disregarded its duty to deal fairly and act in good faith with [Plaintiffs], or [State Farm] has intentionally and with malice breached said duty." *Badillo v. Mid Century Ins. Co.*, 2005 OK 48, ¶ 64, 121 P.3d 1080, 1105 (citations omitted). A trial court does not err by directing a verdict denying punitive damages if there is no evidence a reasonable jury could rely on that shows, at a minimum, reckless disregard. *Id.* ¶ 64, 121 P.3d at 1106. Furthermore, "[w]hether that showing has been made remains an issue of law for the trial court in its role as gatekeeper." *Id.* ¶ 66, 121 P.3d at 1106.

Even in the event the Court does not grant State Farm's motion as to Plaintiffs' bad faith claim, it is well-settled Oklahoma law that punitive damages do not *ipso facto* follow from *every* breach of the duty of good faith and fair dealing or in *every* case a jury may render a verdict for the wronged party. *See id.* ¶ 65, 121 P.3d at 1106; Indeed, "[e]ven where there is evidence to support the recovery of actual damages in a bad faith action against an insurer, submission of the issue of punitive damages to a jury may be improper." *Willis v. Midland Risk Ins. Co.*, 42 F.3d 607, 614-15 (10th Cir. 1994) (citation omitted). Because of the serious nature of punitive damages, the Court should first examine the threshold question of whether evidence exists to submit a punitive-damages request to a jury as a matter of law. Here, Plaintiffs have none.

Plaintiffs cannot recover Category 1 punitive damages because there is no evidence

of reckless disregard like that which has been determined as sufficient to support punitive damages. *Compare, e.g.*, *Moore v. Allstate Ins. Co.,* No. CIV-12-652-D, 2014 WL 200777, at *4 (W.D. Okla. Jan. 17, 2014) (finding evidence an insurer never performed the investigation or inspection its own engineer recommended and did not issue the payment its appraiser said was owed), *with* UMF Nos. 1-46. Moreover, because State Farm acted reasonably as to Plaintiffs, as explained *supra*, it necessarily follows that State Farm did not recklessly disregard its duty to deal fairly and act in good faith. *See Agrawal v. Farmers Ins. Co.*, No. 11-CV-87-GKF-TLW, 2012 WL 124547, at *4 (N.D. Okla. Jan. 17, 2012).

Likewise, Plaintiffs cannot recover Category 2 or 3 punitive damages because there is no evidence of malice or intentional wrongdoing like that which has been determined to be sufficient to support punitive damages. *Compare, e.g.*, *Timmons v. Royal Globe Ins. Co.*, 653 P.2d 907, 917 (Okla. 1982), *with* UMF Nos. 1-46. In sum, Plaintiffs' evidence wholly fails to support submitting the question of punitive damages to a jury.

## **CONCLUSION**

Plaintiffs lacks any evidence to support either their contract claim or their bad faith claim which would allow them to reach a jury on either. Indeed, the actual theories of liability identified by Plaintiffs—that State Farm should have acted inconsistent with the terms of the Policy and speculation regarding the thoroughness of the reconciliation of two particular estimates—simply lack any basis in law or in fact, respectively. And no other possible theory has been presented by Plaintiffs which can gain them access to a jury, particularly with regard to their bad faith claim. Summary judgment on all claims should be entered for State Farm.

Respectfully submitted,


*s/ Andrew J. Morris*
Andrew J. Morris, OBA #31658
Peyton S. Howell, OBA #33917
McAfee & Taft, a Professional Corporation
8th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102
Telephone:   (405) 235-9621
Facsimile:    (405) 235-0439
andrew.morris@mcafeetaft.com
peyton.howell@mcafeetaft.com

*and*

Jessica L. Dickerson, OBA #21500
McAfee & Taft A Professional Corp.
Williams Center Tower II
Two West Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone:      (918) 587-0000
Facsimile:       (918) 599-9317
jessica.dickerson@mcafeetaft.com

***Attorneys for Defendant State Farm***
***Fire and Casualty Company***