## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STEPHEN MULLICAN AND KELLEY MULLICAN, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. CIV-23-160-G |
| STATE FARM FIRE AND CASUALTY COMPANY, | ) ) ) ) | |
| Defendant. | ) ) | |

## STATE FARM'S MOTION TO EXCLUDE TESTIMONY OF
## PLAINTIFFS' PURPORTED EXPERT IAN RUPERT
## AND BRIEF IN SUPPORT

Andrew J. Morris, OBA #31658
Peyton S. Howell, OBA #33917
McAfee & Taft A Professional Corporation
Eighth Floor, Two Leadership Square
211 North Robinson Avenue
Oklahoma City, OK 73102
Telephone:      (405) 235-9621
Facsimile:      (405) 235-0439
andrew.morris@mcafeetaft.com
peyton.howell@mcafeetaft.com

Jessica L. Dickerson, OBA #21500
McAfee & Taft A Professional Corp.
Williams Center Tower II
Two West Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone:      (918) 587-0000
Facsimile:      (918) 599-9317
jessica.dickerson@mcafeetaft.com

***Attorneys for Defendant State Farm
Fire and Casualty Company***

## <u>TABLE OF CONTENTS</u>

MOTION ................................................................................................................. 1

BRIEF IN SUPPORT .............................................................................................. 1

    INTRODUCTION ................................................................................................ 1

    BACKGROUND .................................................................................................. 2

    ARGUMENTS AND AUTHORITIES ................................................................ 3

        I.      Mr. Rupert's proposed testimony is not reliable because it
has almost no basis in the law or in the at-issue Policy. ................... 5

        II.     Mr. Rupert's testimony should be excluded because he has
a financial interest in the litigation's outcome. ............................... 17

        III.    Mr. Rupert's testimony includes issues of law on which
only the Court can instruct and which would not be useful
to the jury. ....................................................................................... 19

    CONCLUSION .................................................................................................. 21

## <u>TABLE OF AUTHORITIES</u>

**Judicial Opinions**                                                                              **Page(s)**

*Aduddell Lincoln Plaza Hotel v. Certain Underwriters at Lloyd's of Lonon*,
    2015 OK CIV APP 34, 348 P.3d 216 ............................................................... 10

*Anderson v. Suitors*,
    499 F.3d 1228 (10th Cir. 2007) ................................................................... 20

*Bannister v. State Farm Mut. Auto. Ins. Co.*,
    692 F.3d 1117 (10th Cir. 2012) ................................................................... 10

*Burleson v. Tex Dep't of Criminal Justice*,
    393 F.3d 577 (5th Cir. 2004) ........................................................................ 4

*Cosgrove v. Sears Roebuck & Co.*,
    No. 81 Civ. 3482 (CSH), 1987 WL 33595 (S.D.N.Y. Dec. 21, 1987) ................. 18-19

*Curtis v. Progressive N. Ins. Co.*,
    No. CIV-17-1076-PRW, 2022 WL 109003 (W.D. Okla. Jan. 11, 2022) ................. 14

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993) ............................................................................. 1, 3-4

*Dodson v. St. Paul Ins. Co.*,
    812 P.2d 372 (Okla. 1991) .......................................................................... 13

*Farmer v. Ramsey.*,
    No159 F. Supp. 2d 873 (D. Md. 2001) .......................................................... 18

*Godfrey v. CSAA Fire & Cas. Ins. Co.*,
    No. CIV-19-329-JD, 2020 WL 1056306 (W.D. Okla. Mar. 4, 2020) ................. 10-11

*Govinda, LLC v. Columbia Mut. Ins. Co.*,
    545 F. Supp. 3d 1167 (W.D. Okla. 2021) .................................................... 19-20

*Graves v. Am. Fam. Mut. Ins. Co.*,
    686 F. App'x 536 (10th Cir. 2017) ............................................................... 15

*Green v. Bd. of Cnty. Comm'rs*,
    No. 05-CV-406-RAW, 2006 WL 6861763 (E.D. Okla. Apr. 12, 2006) ................. 17

*Harris v. Remingon Arms Co., LLC,*
  398 F. Supp. 3d 1126 (W.D. Okla. 2019) ....................................................... 5

*Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc.,*
  No. 5:18-CV-39, 2019 WL 1756292 (W.D. Va. Apr. 19, 2019) ................................. 18

*Kumho Tire Co. v. Carmichael.,*
  526 U.S. 137 (1999) ............................................................................ 3-4

*Lopez v. Farmers Ins. Co.,*
  No. CIV-10-584-HE, 2011 WL 2020699 (W.D. Okla. May 24, 2011) ...................... 4-5

*Miller v. CSAA Gen. Ins. Co.,*
  609 F. Supp. 3d 1226 (N.D. Okla. 2022) .................................................. 13-14

*MTV Cap. Ltd. P'ship v. Quvix, Inc.,*
  No. CIV-07-981-HE, 2008 WL 5516517 (W.D. Okla. Nov. 12, 2008) .................... 20

*Perfect 10, Inc. v. Giganews, Inc.,*
  No. CV-11-7098-AB, 2014 WL 10894452 (D. Colo. Oct. 31, 2014) ..................... 18

*Raley v. Hyundai Motor Co.,*
  No. CIV-08-376-HE, 2010 WL 199973 (W.D. Okla. Jan. 14, 2010) .................... 17

*Ralston v. Smith & Newphe Richards, Inc.,*
  275 F.3d 965 (10th Cir. 2001) ................................................................ 4

*Selvidge v. United States,*
  160 F.R.D. 153 (D. Kan. 1995) ............................................................. 17

*United States v. Nacchio,*
  555 F.3d 1234 (10th Cir. 2009) .............................................................. 5

*Wheatridge Office, LLC v. Auto-Owners Ins. Co.,*
  578 F. Supp. 3d 1187 (D. Colo. 2022) ..................................................... 18

*Yeager v. Buxton,*
  No. 17-2368-KGG, 2018 WL 4620884 (D. Kan. Sept. 26, 2018) ....................... 4

**Statutes** **Page(s)**

Unfair Claims Settlement Practices Act,
   Okla. Stat. tit. 36, § 1250.1 *et seq* ...................................................................10-11, 19

**Rules and Regulations** **Page(s)**

Federal Rule of Evidence 401 ................................................................................ 1, 11

Federal Rule of Evidence 402 ................................................................................... 1

Federal Rule of Evidence 403 ................................................................................ 1, 11

Federal Rule of Evidence 701 ................................................................................... 1

Federal Rule of Evidence 702 .........................................................................1, 3-4, 16

Okla. R. Prof'l Conduct R. 3.4(b) ........................................................................... 19

Local Civ. R. 83.6(b) ............................................................................................ 19

## MOTION

Defendant State Farm Fire and Casualty Company ("State Farm") respectfully requests that the Court exclude the testimony of Plaintiffs' proffered non-retained expert witness, Ian Rupert, pursuant to Federal Rules of Evidence 701, 702 and 401-403, as well as *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny, and the additional authorities cited herein.

## BRIEF IN SUPPORT

## INTRODUCTION

Plaintiffs designated Ian Rupert as a non-retained expert in this case. *See* ECF No. 23. But Mr. Rupert should be excluded from testifying at trial. And the Court should not consider any deposition testimony given by him offered by Plaintiffs in opposition to State Farm's summary judgment motion. As an initial matter, Mr. Rupert's opinions do not meet *Daubert*'s requirements. Mr. Rupert's testimony is not reliable because it is wholly divorced from Oklahoma law and is not grounded in the actual terms of the Policy entered into by Plaintiffs and State Farm. Instead, Mr. Rupert's opinions are simply what he, based on his own personal worldview, believes should have occurred in this case. I.e., not what was or was not required by applicable authorities.

Additionally, Mr. Rupert stands poised to recover 20% of any damages awarded to Plaintiffs. His contract for services places him in the improper position of an advocate who is financially incentivized to ensure Plaintiffs succeed (and recover more damages) in their claims against State Farm.

Finally, to the extent Mr. Rupert opines on questions of law, the legal interpretation of the subject insurance contract, and the ultimate question the jury is to decide, those opinions should be excluded. Such matters are within the exclusive province of this Court or the jury, and any expert—even a licensed attorney, which Mr. Rupert is not—lacks qualifications to proffer such legal or ultimate-fact opinions at trial. For any and all of these reasons, Mr. Rupert's opinions do not satisfy requirements for expert opinion testimony and his testimony should be excluded.

## **BACKGROUND**

This lawsuit involves a dispute between insureds and their insurer which developed after a fire loss. State Farm promptly investigated and issued payments to Plaintiffs for the actual cash values of their dwelling and personal property—totaling more than $140,000 for their dwelling claim, nearly $60,000 for their personal property claim, and more than $15,000 for their loss of use claim (i.e., to provide for alternative housing, while their dwelling purportedly was being repaired). Additionally, nearly $90,000 was available to Plaintiffs in replacement cost benefits if Plaintiffs made the repairs to their home and replaced their lost personal property—all pursuant to the terms of the Policy entered into by Plaintiffs and State Farm. But Plaintiffs never repaired their home and never replaced their personal property, choosing instead to live in alternative housing paid for by State Farm and then sell their home to a third party. *See* Mot. for Summary J., ECF No. 34. During the latter part of their insurance claim, Plaintiffs retained Mr. Rupert as a public adjuster.

Plaintiffs do not assert many allegations against State Farm in this lawsuit. During their depositions, Plaintiffs only identified three issues: (i) that they believed State Farm should not have withheld depreciation from their payments (i.e., paid replacement costs instead of the actual cash values), (ii) that they believed State Farm representative Hali Goss did not adequately reconcile State Farm's estimate with the estimate issued from Plaintiffs' public adjuster—though they could not identify how her analysis was insufficient—and (iii) that they should have received loss of use benefits for alternative housing after they sold their home and no longer had any right to live in it, notwithstanding that it had been affected by a fire. Still, Plaintiffs seek to make their public adjuster, Mr. Rupert, not just a fact witness at trial, but also a non-retained expert. They should be prohibited from doing so.

## **ARGUMENTS AND AUTHORITIES**

In the wake of *Daubert*, 509 U.S. 579, and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), courts have become proactive in protecting jurors from unsubstantiated and unnecessary expert opinion testimony. Rule 702 now codifies the Supreme Court's decision in *Daubert*, which assigned "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also* Fed. R. Evid. 702 advisory committee's note (2000). Now, Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the

product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment of "whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see also Kumho Tire*, 526 U.S. at 147. And the *Daubert* standard applies regardless of whether an expert has been retained or not. *E.g. Yeager v. Buxton*, No. 17-2368-KGG, 2018 WL 4620884, at *5 (D. Kan. Sept. 26, 2018) (applying *Daubert* to non-retained witnesses who were treating physicians).

"In deciding the admissibility of expert testimony, the court must determine whether the expert is proposing to testify to scientific or other specialized knowledge which will assist the trier of fact in understanding or determining a fact in issue." *Lopez v. Farmers Ins. Co.*, No. CIV-10-584-HE, 2011 WL 2020699, at *1 (W.D. Okla. May 24, 2011) (citing *Daubert*, 509 U.S. at 592). First, the court must determine if the expert is qualified. *See Ralston v. Smith & Nephew Richards, Inc*., 275 F.3d 965, 969 (10th Cir. 2001). That is, the Court must determine whether the expert is qualified to render an opinion by reason of "knowledge, skill, experience, training, or education." *Id.* (citation and quotation marks omitted). The expert must know whereof he speaks and his qualifications and training must be related to the subject matter of the proposed testimony.

"The court then must conduct a two-part inquiry to fulfill its *Daubert* gatekeeping role, determining first if the expert's proffered testimony has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" *Lopez*, 2011 WL 2020699, at *1

(quoting *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232-33 (10th Cir. 2004)). The Court must decide whether the reasoning or methodology underlying the testimony is scientifically valid. *See id.* Finally, the Court must determine whether the opinion testimony is " sufficient 'relevant to the task at hand." *Id.* (quoting *Bitler*, 400 F.3d at 1234). The burden of establishing the admissibility of an expert witness falls on the party offering the witness's testimony—here, Plaintiffs. *See United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc); *Harris v. Remington Arms Co., LLC*, 398 F. Supp. 3d 1126, 1130 (W.D. Okla. 2019) (applying *Nacchio* in a civil case).

**I.    Mr. Rupert's proposed testimony is not reliable because it has almost no basis in the law or the at-issue Policy.**

During his deposition, Mr. Rupert was asked to identify and explain the opinions that he intends to offer at trial. *See* **Ex. 1**, Rupert Dep. 226:24-227:7 (indicating that Mr. Rupert seeks to testify regarding both the alleged breach of contract claim and its bases, as well as the alleged bad faith claim "if the Court allow[s]"). Nearly all of his opinions are devoid of support in the law. And many are directly contrary to the terms of the Policy at issue in this lawsuit. Mr. Rupert, whether acting as a public adjuster or as an expert witness, does not get to decide for himself what he believes the terms of the parties' agreement should be or what the law should be. Because that is what he has done, his testimony as a whole should be excluded for a lack of reliability and because such an approach is not based in any dependable form of scholarship.

***First***, Mr. Rupert relied in his opinions on not just potentially applicable Oklahoma laws, but also laws from other states, as well as model laws which may or may not have

been adopted in some form in Oklahoma—and may not have yet been adopted in any form

anywhere at all. Still, he purports to apply other jurisdictions' laws or non-adopted model

codes to this insurance claim pending in Oklahoma:

> Q.      So your belief is that if you as a public adjuster instruct an insurance
> adjuster to take action in a certain way that you can dictate what the insurance
> has to do even if it's not included in a statute or regulation requiring them to
> do it that way?
>
> A.      No.
>
> Mr. MCKEEVER: Object to the form. Go ahead.
>
> Q. (BY MR. MORRIS) Where did I get that wrong?
>
> A.      No. No. I said that if we send written correspondence, we expect it to
> be responded to in writing. That's what I said. And I believe is required.
>
> You can read the statute maybe both ways. But I have seen Unfair Claim
> Settlement Practices Act and looked at model acts and things like that. If you
> send something in writing, the insurance company should respond in writing.
>
> A phone call is not going to cut it. But like I said earlier, if their phone call
> is adequate and I do not require that they provide their response in writing,
> then I'm probably not going to make an issue of it.
>
> Q.      Those model acts you're referring to are from outside Oklahoma; is
> that correct?
>
> A.      Yes.
>
> Q.      Okay.
>
> A.      However, that does inform us how to handle claims in good faith.
>
> Q.      It is your position that a model act that has not been adopted by the
> Oklahoma Legislature informs what an insurer is required to do to act in good
> faith inside of Oklahoma.
>
> A.      It -- yes. Yes, I do. I think that that's excellent evidence of what good
> faith claims handling is like. Yes.

**Ex. 1**, Rupert Dep. 168:19-170:5. The authorities on which Mr. Rupert depends have no controlling authority to insurance claims which are subject to Oklahoma law, and his reliance on them makes suspect his overall approach to testifying and developing his opinions regarding insurance-claim-handling practices.

 ***Second***, Mr. Rupert took the position that an insurer is required to pay loss of use funds for an insured to live at an alternative location when the insured premises is not habitable even if the insured never begins repairs. But his position lacks any basis in the Policy. Indeed, the Policy states:

> COVERAGE C – LOSS OF USE
>
> The most we will pay for the sum of all losses combined under Additional Living Expense, Fair Rental Value, and Prohibited Use is the limit of liability shown in the Declarations for Coverage C – Loss of Use.
>
> 1. Additional Living Expense. When a loss insured causes the residence premises to become uninhabitable, we will pay the reasonable and necessary increase in cost incurred by an insured to maintain their normal standard of living for up to 24 months. Our payment is limited to incurred costs for the shortest of:
>
>   a. the time required to repair or replace the premises;
>
>   b. the time required for your household to settle elsewhere; or
>
>   c. 24 months.
>
> This period of time is not limited by the expiration of this policy.
>
> We will not pay more than the limit of liability shown in the Declarations for Coverage C – Loss of Use. Any normal expenses that are reduced or discontinued due to a loss insured will be subtracted from any amount owed.

Policy, at Mullican-SF_00024, ECF No. 34-1 (emphasis omitted). In his testimony (set forth *infra*), Mr. Rupert relied on subpart (a) above—"the time required to repair or replace

the premises." *Id.* But he took the position that this period could last up to 24 months even if an insured did not start repairs. And that sort of approach effectively writes out the word "required" from the Policy's approach of limiting payments to "the time required to repair or replace the premises." Said differently, if a house is not habitable and repairs are only going to take one month, an insured cannot simply choose to live elsewhere for two entire years while forcing the insurer to pay for him or her to do so by deferring starting the single-month's worth of repairs. This is because two years is not the time "required" for repairs to be completed under those circumstances; one month is.

That is the approach Mr. Rupert would allow though—essentially replacing "the time required to repair or replace the premises" with "the time [chosen by the insured] to repair or replace the premises." *Id.*

> Q      If the -- let me simplify this. Is it your position that loss of use payments are still required after an insured no longer owns the insured premises?
>
> A      We'd have to look at the policy to be certain about this but the obligation is not tied to the timing of the sale of the property. The obligation is tied to the time it takes for them to permanently relocate.
>
> And as far as I know, Mullican has not actually permanently relocated. They have been staying in managers quarters.
>
> Q      If, in your understanding of how this is supposed to work, if an insured relocates after let's say a fire and decides never to move back to the location of the fire, how long do you believe an insurer is required to continue paying loss of use?
>
> A      To the limit of the policy.
>
> Q      So that could be, for example, up to let's say two years even if no repair work is ever begun on the property and there's no dispute as to the amount to be paid?

> A    If it's a permanent relocation, yes. But in this situation the insured was financially pressured to stay in managers quarters. So the obligation would go to the limit of the policy which there would be a time limit as well as a monetary limit.

**Ex. 1**, Rupert Dep. 130:2-131:3. Further, Mr. Rupert's opinion with regard to the time of permanent relocation is directly at odds with Mr. Mullican's testimony. *See* S. Mullican Dep. 139:13-22, ECF No. 34-5. This further undercuts the reliability of Mr. Rupert's testimony, as he did not review or depend on Plaintiffs' statements to shape his testimony. *See* **Ex. 1**, Rupert Dep. 79:10-80:24.

Additionally, with regard to the loss of use benefits at issue, Mr. Rupert refused to take into consideration the sale of Plaintiffs' home when opining on how the Policy's provisions should be applied to the facts of this case:

> Q    Okay. And so as between the two periods we just talked about, the period where they were staying with I think you said a relative and then the later period where they were staying in Shawnee, your complaint about noncomparable housing, does that apply to both periods or just one or the other?
>
> A    You know, I really can't hang -- I do try to give credit where credit is due. I really cannot hang the living arrangement with the relative as being State Farm's mishandling of the claim. I can only hang them with the mishandling after my involvement and presentment of a proper loss of use amount and any underpayment thereon.

**Ex. 1**, Rupert Dep. 128:17-129:4; *see also id.* at 130:2-131:3.

This position is, again, in direct contradiction to the Policy's language limiting payment of additional living expense funds to circumstances during which "the residence premises . . . become[s] uninhabitable" as a result of "a loss insured." Policy, at Mullican-

SF_00024, ECF No. 34-1. State Farm does not dispute that the fire caused the uninhabitability which existed for at least part of the period *prior* to Plaintiffs' sale of their home. But Mr. Rupert does not complain about a lack of payment during that time. *See* **Ex. 1**, Rupert Dep. 128:17-129:4 Instead, his complaints are focused on and include the period *after* May 7, 2021—the date on which the home sale occurred. And, in that period of time, it was not a "loss insured"—i.e., the fire—that prohibited Plaintiffs from inhabiting the insured premises. *Id.* It was that they no longer had any ownership interest in or right to reside at the premises because of the sale.

_**Third**_, Mr. Rupert may undertake to assess State Farm's actions during the pre-litigation, claim-handling period via reference to the Unfair Claims Settlement Practices Act, 36 Okla. Stat. §§ 1250.1 *et seq.* ("UCSPA"). *See* **Ex. 1**, Rupert Dep. 153:11-158:6. But case law is clear that the UCSPA may _not_ be used by a jury to assess the conduct of an insurer. *See Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1128 n.11 (10th Cir. 2012) ("[A]n insurer's violation of the regulation under that Act does not give rise to an inference of bad faith in the context of this tort action [for bad faith]."); *Aduddell Lincoln Plaza Hotel v. Certain Underwriters at Lloyd's of London*, 2015 OK CIV APP 34, ¶ 24, 348 P.3d 216, 223 (indicating that the UCSPA "was designed to provide the Insurance Commissioner with power to regulate the insurance industry" and "does not create a private remedy" and determining that an instruction allowing for a jury to consider Oklahoma's Unfair Claims Settlement Practices Act in determining whether bad faith occurred was erroneous); *Godfrey v. CSAA Fire & Cas. Ins. Co.*, No. CIV-19-329-JD, 2020 WL 1056306, at *5 (W.D. Okla. Mar. 4, 2020) (collecting cases and determining that "evidence

and reference to the Oklahoma Unfair Claims Settlement Practices Act as a proxy to determine bad faith is irrelevant under Federal Rule of Evidence 401 and, regardless, would be unfairly prejudicial and confuse the issues under Federal Rule of Evidence 403"). Accordingly, Mr. Rupert's opinions based on his attempts to apply the regulatory standard contained in the UCSPA to the case and assess State Farm's performance with regard to an alleged breach of contract and/or alleged acts constituting bad faith are not adequately grounded in the law and reveal the lack of validity and reliability inherent in his opinions.

**_Fourth_**, Mr. Rupert has attempted to add language or modifiers to the Policy's terms where such language is not present. For example, Mr. Rupert takes the position that State Farm was required to reimburse Plaintiffs for an engineer whom Plaintiffs hired (via Mr. Rupert) to create a report regarding what the alleged needs were to repair the home. But Mr. Rupert cannot provide any actual authority for his position:

> Q      Okay. You earlier referenced fault of State Farm for not paying the cost of an engineer that I believe was retained at your recommendation; correct?
>
> A      Correct.
>
> Q      Okay. That was Valor Forensic Services or Valor-something?
>
> A      Yes.
>
> Q      Okay. And it's your belief that State Farm is required to pay the cost of that engineer; is that correct?
>
> A      Yes.
>
> Q      What's your basis for that belief?
>
> A      Duties after a loss. One of the duties is: "Submit to us within 60 days after a lost your signed and sworn proof. " And then one of the enumerated requirements is:

"Specifications of any damaged structure and detailed estimates for repair of the damage."

Q        What page are you reading from [ ] the policy?

A        It's my production page 1327. The page number referenced in this copy of the policy is No. 20.[1]

Q        And that's form HW2136?

A        Yes.

Q        Is there any reference there to payment of expenses by an insurance company?

A        It's implicit in the language. The insurance company can't require you to do something that they're not willing to pay you for.

**Ex. 1**, Rupert Dep. 177:18-178:24 (footnote added).

Included as one of the insured's "duties after loss" in the Policy is for the insured to "submit to [State Farm], within 60 days after the loss, . . . to the best of [the insureds'] knowledge and belief . . . specifications of any damaged structure and detailed estimates for repair of the damage." Policy, at Mullican-SF_00036, ECF No. 34-1. But there is no promise or duty in the Policy, implied or otherwise, that State Farm will pay via coverage any expenses that an insured incurs in putting together the "specifications"—which need only be "to the best of the [insureds'] knowledge and belief" when submitted at the appropriate time. *Id.* Further, the Policy's insuring clause provides no basis for an expectation of payment for a third-party specialist chosen by insureds—much less one chosen without allowing State Farm to have input in the selection process (as occurred here). *See id.* at Mullican-SF_00021 ("We cover the dwelling and materials and supplies

---

[1] The referenced page is at Mullican-SF_00036 in the Policy, ECF No. 34-1.

located on or adjacent to the residence premises for use in the construction, alteration, or repair of the dwelling or other structures on the residence premises." (emphasis omitted)).

Similarly, Mr. Rupert states that payments made under the dwelling coverage (i.e., damages to the home, itself) can be applied at a location different from the insured premises and still fall under the coverage provided by the Policy. *See* **Ex. 1**, Rupert Dep. 184:2-13. But, again, the Policy says different—and Mr. Rupert has no basis other than his own say-so for departing from the Policy's terms. Specifically, the Policy's dwelling coverage is for "the dwelling and materials and supplies *located on or adjacent to the residence premises*," and loss of use coverage only applies during the time that "a loss insured causes the *residence premises* to become uninhabitable." Policy, at Mullican-SF_00021, _00024, ECF No. 34-1 (emphasis adjusted).

In both examples above, Mr. Rupert's proposed testimony would invite the Court and a jury to re-write the Policy with additional or extra terms to reach what Mr. Rupert believes *should* be in the Policy, regardless of what its terms and requirements actually *are*. The Court should not engage in such actions. *See Dodson v. St. Paul Ins. Co.*, 812 P.3d 372, 376 (Okla. 1991) ("Parties to [an] insurance contract are at liberty to contract for insurance to cover such risks as they see fit and are bound by the terms of contract and courts will not undertake to rewrite terms thereof." (quotation marks omitted)); *Miller v. CSAA Gen. Ins. Co.*, 609 F. Supp. 3d 1226, 1230 (N.D. Okla. 2022) ("Under Oklahoma law, an insurance contract should be construed according to the terms set out within the four corners of the document. If the terms of the contract are unambiguous, clear and consistent, they are to be accepted in their ordinary sense and enforced to carry out the

13

expressed intention of the parties. (cleaned up)); *Curtis v. Progressive N. Ins. Co.*, No. CIV-17-1076-PRW, 2022 WL 109003, at *5 (W.D. Okla. Jan. 11, 2022) ("Courts apply the contract as written and do not rewrite an insurance contract to benefit either party." (quotation marks omitted)).

**_Finally_**, Mr. Rupert seeks to opine that "where the insurance company [allegedly] severely underpays a claim and the insured is thereby prohibited from repairing or replacing the property, [the insureds are] . . . entitled to all the depreciation" which otherwise would be withheld, without waiting until repairs or replacements have been made.[2] **Ex. 1**, Rupert Dep. 194:4-8. Again, this is directly contrary to the terms and requirements of the Policy:

**COVERAGE A – DWELLING**

1. **A1 – Replacement Cost Loss Settlement – Similar Construction.**

    a. **_We_** will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the **_Declarations_**, the damaged part of the property covered under **SECTION I – PROPERTY COVERAGES, COVERAGE A – DWELLING**, except for wood fences, subject to the following:

        (1)    until actual repair or replacement is completed, **_we_** will

---

[2] Even if Mr. Rupert were correct regarding depreciation availability, there was no "severe underpayment" on the dwelling claim by State Farm. State Farm made actual cash value payments in excess of $140,000.00 based on an overall estimate with a replacement cost of $202,256.90. And State Farm indicated, if repairs were actually completed, it would pay replacement cost benefits according to the Policy—up to the Policy's adjusted dwelling limit of $198,830.00. *See* Mot. for Summary J., ECF No. 34. Thus, there was no "severe underpayment" regarding the actual cash value. Further, there could not have been any underpayment *at all* for the replacement cost because Plaintiffs were slated to get the maximum amount available to them under the Policy's dwelling coverage once repairs were made.

pay only the *actual cash value* of the damaged part of the property, up to the applicable limit of liability shown in the *Declarations*, not to exceed the cost to repair or replace the damaged part of the property;

(2)    when the repair or replacement is actually completed, *we* will pay the covered additional amount *you* actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the *Declarations*, whichever is less;

(3)    to receive any additional payments on a replacement cost basis, *you* must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify *us* within 30 days after the work has been completed; and

(4) *we* will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair, or demolition of a *building structure* or other structure, except as provided under **OPTIONAL POLICY PROVISIONS**, **Option OL – Building Ordinance or Law**.

Policy, at Mullican-SF_00034, ECF No. 34-1; *see also id.* at Mullican-SF_00035 (including a similar approach for personal property replacements).

Nowhere in the law or in the Policy is there any basis to simply disregard the loss settlement provision above and force an insurer to pay the entire replacement cost in circumstances like are present here—without regard to depreciation and whether repairs actually were made. Indeed, Mr. Rupert's approach would throw the entire insurance system of replacement cost policies topsy-turvy because the approach taken by State Farm here—payment of actual cash value first, with payment up to the replacement cost later on for those repairs and replacements made—is exactly how this type of coverage is supposed

to work. *See Graves v. Am. Fam. Mut. Ins. Co.*, 686 F. App'x 536, 539 (10th Cir. 2017) ("Under a replacement cost policy, the insured must actually repair or replace the damaged property in order to recover the full replacement cost; otherwise, the insured may recover only the actual cash value. The reason for this requirement is to prevent an insured from directly profiting through the receipt of cash funds beyond the actual cash value of the loss." (cleaned up) (addressing a Kansas case, but without any state-law specificity required for the particular point indicated)); *see also* Order of Sept. 9, 2023, *Steinkamp v. State Farm Fire & Cas. Co.*, No. CIV-22-47-PRW, ECF No. 21, at *4 (not available on Westlaw) (quoting the same loss settlement provision as is present in the instant case and stating that its approach "is exactly what a replacement cost policy is—an insurance policy provision in which the insurer agrees to pay the insured the cost to repair or replace her damaged property after the insured has actually repaired or replaced the property"). As stated by the Tenth Circuit, an approach which does not include a later payment of depreciation "would in effect reduce, if not eliminate, the distinction between an 'actual cash value' policy and the more expensive 'replacement cost' policy." *Graves*, 686 F. App'x at 537; *see also id.* at 539 ("Had [the insured] wanted to recover the full replacement cost under her policy she should have had the repairs completed by the [policy's] deadline.").

All told, Mr. Rupert's opinions lack reliability because of his propensity to go beyond the law and outside of the terms of the Policy. As a result, his testimony may and should be excluded from trial.

## II.    Mr. Rupert's testimony should be excluded because he has a financial interest in the litigation's outcome.

An expert witness's purpose is to assist the jury to "understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Courts recognize that experts, by their nature, should not act as advocates. "An expert witness should never become one party's expert advocate" (*Selvidge v. United States*, 160 F.R.D 153, 156 (D. Kan. 1995)), and courts have excluded expert testimony based on improper advocacy. *E.g. Raley v. Hyundai Motor Co.*, No. CIV-08-376-HE, 2010 WL 199976, at *7 (W.D. Okla. Jan 14, 2010) (excluding expert testimony where the expert "assum[ed] the role of an advocate rather than an expert."); *Green v. Bd. of Cnty. Comm'rs*, No. 05-CV-406-RAW, 2006 WL 6861763, at *1 (E.D. Okla. Apr. 12, 2006) (excluding expert where report did not "represent[] an objective balance of views, but rather the zealous views of an advocate").

In this case, Mr. Rupert is the sole member of Ian's Enterprise, LLC. **Ex. 1,** Rupert Depo. 38:5-21. And Ian's Enterprise, LLC entered into a contract with Plaintiffs wherein his company is entitled to "20% of the . . . . total amount ultimately recovered from the insurer . . . . in the event of attorney involvement and/or litigation against the insurer" plus reimbursement for "all reasonable and necessary expenses" of Ian's Enterprise. **Ex. 2,** Contract, at IELLC Production 37. This contract provides that Mr. Rupert will recover more if larger amounts of damages are awarded to Plaintiffs, thereby financially incentivizing him to assist in reaching that result. This inevitability creates an unavoidable bias and makes his testimony is inherently unreliable.

This point is illustrated by *Wheatridge Office, LLC v. Auto-Owners Insurance Co.*, 578 F. Supp. 3d 1187 (D. Colo. 2022). There, when proposed expert testimony was excluded, the court explained that it is "a settled principle of American law: expert witnesses should not receive contingent fees." *Id.* at 1210 (quotation marks and citation omitted). "This principle is well accepted because 'an expert witness whose fee is contingent upon the outcome is improperly motivated and can not objectively inform the court on an issue about which the court needs additional instruction." *Id.*; *see also Perfect 10, Inc. v. Giganews, Inc.*, No. CV-11-7098-AB, 2014 WL 10894452, at *4 (D. Colo. Oct. 31, 2014) (excluding expert testimony because "[o]nce the expert obtains a direct financial interest in the outcome of the litigation (whether by his or her status as a party, by contingency fee agreement, or otherwise), any semblance of independence or promise of intellectual rigor that normally adheres to an expert witness is fatally wounded.").

Numerous other courts have excluded expert testimony where an expert has a financial interest in the outcome of the case as well. *See, e.g., Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc.*, No. 5:18-CV-39, 2019 WL 1756292, at *3 (W.D. Va. Apr. 19, 2019) ("Regardless of the basis, the court concludes that [the proffered witness] should not be permitted to testify as an expert because of the clear bias he has as a result of his direct financial incentives in the outcome of this case."); *Farmer v. Ramsay*, 159 F. Supp. 2d 873, 883 (D. Md. 2001), (striking expert testimony and referencing Maryland's Rule of Professional Conduct 3.4 because "[u]nder the common law in most jurisdictions, including Maryland, 'it is improper to pay an expert witness a contingent fee.'") *aff'd*, 43 F. App'x 547 (4th Cir. 2002); *Cosgrove v. Sears Roebuck & Co.*, No. 81 Civ. 3482 (CSH),

1987 WL 33595, at *1 (S.D.N.Y. Dec. 21, 1987) (precluding an expert from offering testimony in a case after it was revealed the expert would only be compensated if the plaintiff was successful on her claims).

Additionally, the Oklahoma Rules of Professional Conduct caution against such testimony and generally preclude a lawyer from "offer[ing]an inducement to a witness that is prohibited by law." *See* Okla. R. Prof'l Conduct R. 3.4(b). In the Comments , Rule 3.4(b) is explained as precluding a contingent fee to a witness:

> With regard to paragraph (b), it is not improper to pay a witness's expenses or to compensate an expert witness on terms permitted by law. The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying and that it is *improper to pay an expert witness a contingent fee.*

O.R.C.P., Rule 3.4, Comment 3 (emphasis added)); *see also* Local Civ. R. 83.6(b) (adopting the Oklahoma Rules of Professional Conduct to apply in the U.S. District Court for the Western District of Oklahoma).

Here, Mr. Rupert's financial interest in this litigation as the sole member of the company that stands to profit from a judgment in favor of Plaintiffs prevents him from offering expert testimony in this matter.

## III.   Mr. Rupert's testimony includes issues of law on which only the Court can instruct and which would not be useful to the jury.

Finally, most of Mr. Rupert's proposed testimony goes beyond the appropriate role of an expert witness and invades the provinces of the Court and jury. "The interpretation of an insurance contract and whether it is ambiguous is determined by the court as a matter of law." *Govinda, LLC v. Columbia Mut. Ins. Co.*, 545 F. Supp. 3d 1167, 1170 (W.D. Okla.

2021). And expert opinions on pure issues of law are disfavored. *Anderson v. Suitors*, 499 F.3d 1228, 1237 (10th Cir. 2007) (finding that an expert witness may not testify as to ultimate questions of law in the form of legal conclusions or opinions). That is because opinions on pure questions of law "invade the province of the court to instruct as to what the law is." *MTV Cap. Ltd. P'ship v. Quvix, Inc.*, No. CIV-07-981-HE, 2008 WL 5516517, at *3 (W.D. Okla. 2008).

Here, a majority of Mr. Rupert's proposed opinions improperly cross the line into instructions about the law and the Policy. He apparently intends to opine regarding when and to what extent an insurer is required to pay for loss of use benefits due to uninhabitability, and how entitlement to some such benefits is affected or not by the determinations made by an insurer with regard to dwelling payments. *See supra* Part I. He also intends to opine regarding the degree or comparability required between the insured location and the alternative location provided. And he may attempt to apply the UCSPA and opine regarding whether it was, in his opinion, violated by State Farm. Finally, he seeks to opine regarding whether payment of third-party specialists hired by insureds is required and to what extent deductions for depreciation are allowed by the Policy. Instructing regarding these matters of statutory law and regarding what the Policy, which is a contract, means are matters only appropriate for the Court. Mr. Rupert should not be allowed to testify regarding these matters, which appear likely to constitute the majority of his proffered examination.

## **CONCLUSION**

Mr. Rupert may be qualified to testify regarding some topics in some matters based on his background, knowledge, and experience. But, in this case, he has an unavoidable financial interest which prevents his participation as an expert witness of any kind, as well as a goal of opining on matters which are not sufficiently supported by law and contract. Additionally, he seeks to opine on matters which are proper only for judicial instruction. Accordingly, State Farm respectfully requests that the Court exclude the testimony of Plaintiffs' proffered non-retained expert witness Ian Rupert.

Respectfully submitted,

*s/ Andrew J. Morris*
Andrew J. Morris, OBA #31658
Peyton S. Howell, OBA #33917
McAfee & Taft, a Professional Corporation
8th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102
Telephone:   (405) 235-9621
Facsimile:    (405) 235-0439
andrew.morris@mcafeetaft.com
peyton.howell@mcafeetaft.com

*and*

Jessica L. Dickerson, OBA #21500
McAfee & Taft A Professional Corp.
Williams Center Tower II
Two West Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone:      (918) 587-0000
Facsimile:       (918) 599-9317
jessica.dickerson@mcafeetaft.com

***Attorneys for Defendant State Farm
Fire and Casualty Company***

21