IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| STEPHEN MULLICAN AND KELLEY MULLICAN, <br><br> Plaintiffs, <br><br> v. <br><br> STATE FARM FIRE AND CASUALTY COMPANY, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. CIV-23-160-G |

**STATE FARM'S MOTION TO EXCLUDE TESTIMONY OF
PLAINTIFFS' PURPORTED EXPERT DUANE SMITH
AND BRIEF IN SUPPORT**

Defendant State Farm Fire and Casualty Company ("State Farm") respectfully requests that the Court exclude the testimony of Plaintiffs' proffered expert witness, Duane Smith, pursuant to Federal Rules of Evidence 701, 702, and 401-403, as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, and the additional authorities cited herein.[1] Mr. Smith's testimony will not assist the Court or the jury in this case, and it therefore should be excluded.

**BRIEF IN SUPPORT**

**INTRODUCTION AND BACKGROUND**

This lawsuit involves a dispute between insureds and their insurer which developed after a fire loss. State Farm promptly investigated and issued payments to Plaintiffs for the

---

[1] This motion is made pursuant to the Court's Order of February 21, 2024 [ECF No. 33], which set the deadline for this filing.

actual cash values of their dwelling and personal property—totaling more than $140,000 for their dwelling claim, nearly $60,000 for their personal property claim, and more than $15,000 for their loss of use claim (i.e., to provide for alternative housing, while their dwelling purportedly was being repaired). *See* Mot. for Summary J., ECF No. 34. Additionally, nearly $90,000 was available to Plaintiffs in replacement cost benefits if Plaintiffs made the repairs to their home and replaced their lost personal property—all pursuant to the terms of the Policy entered into by Plaintiffs and State Farm. But Plaintiffs never repaired their home and never replaced their personal property, choosing instead to live in alternative housing paid for by State Farm and then to sell their home to a third party.

Plaintiffs designated Duane Smith as an expert witness to testify regarding Plaintiffs' alleged damages. *See* ECF No. 23. In support of this proffer, Mr. Smith produced a Rule 26(a)(2)(B) report in which he undertook "to ascertain the reasonable and necessary costs to repair the damage to the Property at 6000 Country Ridge Lane [which was previously owned by Plaintiffs and is at issue in this lawsuit] that was damaged by a fire event." **Ex. 1**, Smith Report, at SMITH_000001. In doing so, he prepared an estimate of what he described as "the reasonable and necessary costs to repair and/or replace Property considered to be damaged by the October 15, 2020 fire." *Id.* The estimate that he prepared uses a price list from November 2023 (when he prepared his report) to set the costs for individual repair and replacement tasks. *See id.* at SMITH_000002 ("My Estimate includes detailed line-items of property that is damaged and required labor because of the damage using the Xactimate software program with an updated price database that reflects pricing

as of November 2023."); *id.* at SMITH_000011 (showing the price list used) (highlighting added); **Ex. 2**, Smith Dep. 96:10-13 ("Q . . . [If] we go down to your estimate. Looks like you're using a November 23 OKC price list; right? A Yes, sir.").

But the costs for individual tasks in November 2023 are not at issue in this litigation, and Mr. Smith did not submit any alternative pricing model as part of his Rule 26(a)(2)(B) report. *See* **Ex. 2**, Smith Dep. 119:9-19. Instead, the only damages *potentially* at issue are the costs for repairs and replacements which are based on a price list from the date of loss—i.e., October 2020. Because Mr. Smith has not calculated costs based on October 2020 prices, his opinion should be excluded. *Cf. Harris v. Remington Arms Co.*, 398 F. Supp. 3d 1126, 1135-36 (W.D. Okla. 2019) (citing Fed. R. Civ. P. 37(c)(1) and declining to allow an expert to change his theory of causation after a *Daubert* motion and summary judgment motion already had been filed).

## ARGUMENTS AND AUTHORITIES

In the wake of *Daubert*, 509 U.S. 579, and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), courts have become proactive in protecting jurors from unsubstantiated and unnecessary expert opinion testimony. Rule 702 now codifies the Supreme Court's decision in *Daubert*, which assigned "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also* Fed. R. Evid. 702 advisory committee's note (2000). Now, Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help

> the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment of "whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see also Kumho Tire*, 526 U.S. at 147.

"In deciding the admissibility of expert testimony, the court must determine whether the expert is proposing to testify to scientific or other specialized knowledge which will assist the trier of fact in understanding or determining a fact in issue." *Lopez v. Farmers Ins. Co.*, No. CIV-10-584-HE, 2011 WL 2020699, at *1 (W.D. Okla. May 24, 2011) (citing *Daubert*, 509 U.S. at 592). First, the court must determine if the expert is qualified. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). That is, the Court must determine whether the expert is qualified to render an opinion by reason of "knowledge, skill, experience, training, or education." *Id.* (citation and quotation marks omitted). The expert must know whereof he speaks, and his qualifications and training must be related to the subject matter of the proposed testimony.

"The court then must conduct a two-part inquiry to fulfill its *Daubert* gatekeeping role, determining first if the expert's proffered testimony has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" *Lopez*, 2011 WL 2020699, at *1 (quoting *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232-33 (10th Cir. 2004)). The Court must decide whether the reasoning or methodology underlying the testimony is

4

scientifically valid. *See id.* Finally, the Court must determine whether the opinion testimony is "sufficiently 'relevant to the task at hand.'" *Id.* (quoting *Bitler*, 400 F.3d at 1234). The burden of establishing the admissibility of an expert witness falls on the party offering the witness's testimony—here, Plaintiffs. *See United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc); *Harris*, 398 F. Supp. 3d at 1130 (applying *Nacchio* in a civil case).

In this case, the Policy [ECF No. 34-1] provides dwelling coverage ("Coverage A") "for accidental direct physical loss to the property . . . unless the loss is excluded or limited . . . ." Policy, at Mullican-SF_00028, ECF No. 34-1. In issuing payments for the dwelling, "the actual cash value of the damaged part of the property, up to the applicable limit of liability shown in the Declarations" is initially paid, followed by "the covered additional amount [the insured] actually and necessarily spend[s] to repair or replace the damaged part of the property" once "the repair or replacement is actually completed." *Id.* at Mullican-SF_00034.[2] That is, initial payments are for actual cash value, with later payments bringing the total paid up to the replacement cost (less any deductible and subject to the overall limit for the applicable coverage) after work is complete.

---

[2] On the page labeled as Mullican-SF_00034, the section titled "A1 – Replacement Cost Loss Settlement – Similar Construction" applies, not the following section titled "A2" because "[o]nly the Loss Settlement Provisions shown in the Declarations apply." Policy, at Mullican-SF_00034, ECF No. 34-1. And, here, the Declarations page for the Policy states that the in-effect version of the Loss Settlement Provision is "A1 Replacement Cost – Similar Construction." *Id.* at Mullican-SF_00003.

Actual cash value is defined in the Policy, as "the value of the damaged part of the property *at the time of loss*, calculated as the estimated cost to repair or replace such property, less a deduction to account for pre-loss depreciation." *Id.* at Mullican-SF_00017 (emphasis added). This definition is consistent with Oklahoma law, where actual cash value—at least when not defined in the relevant insurance policy—is to be determined "by a consideration of all relevant factors and circumstances existing *at the time of loss*." *Branch v. Farmers Ins. Co.*, 2002 OK 16, ¶ 6, 55 P.3d 1023, 1026 (emphasis added).

Here, the time of loss was in October 2020. *See* Fire Department Report, at SF-Mullican_02361, ECF No. 34-4. And Mr. Smith has not calculated what he believes to be the costs for repairs and replacements utilizing the prices which were in effect in Oklahoma in October 2020. **Ex. 2**, Smith Dep. 96:10-13, 119:9-19. Thus, to the extent Plaintiffs intend to argue that the *actual cash value* paid to them by State Farm was insufficient, Mr. Smith's calculations for Plaintiffs' proposed damages do not follow the methodology demanded by the Policy.

Mr. Smith acknowledges that there likely are significant differences in costs from a price list from 2020 to one from 2023. *See id.* at 95:18-97:2 (acknowledging that an estimate using "the 2020 price list or 2021" and an estimate "using a 2023 [price list] . . . . could [have] a significant difference. . . . [b]ecause pricing alone just with COVID, you know, was a 20 to 30 to 40 percent increase," and further acknowledging the difference which can be caused by even an "almost two-year difference in the pricing"). Still, his scope of work was limited to determining prices according to November 2023 standards only.

Further, to the extent Plaintiffs hope to introduce Mr. Smith's testimony regarding *replacement costs* that they contend may be owed to them, they can no longer recover such amounts. To recover replacement costs, the "actual repair or replacement of the damaged part of the property" must be completed "within two years after the date of loss." Policy, at Mullican-SF_00034, ECF No. 34-1. Here, that would have been by October 15, 2022. But Plaintiffs admit that they never made *any* repairs or replacements to their dwelling beyond initial and minor mitigation work—to say having done so by October 2022.[3]

> Q   Prior to you selling the house, did you make any repairs to the home?
> A   No.
> Q   Did anyone else make any repairs to the home between the time of the fire and when you sold it?
> A   No.
> Q   Other than the little bit of board-up work that ServiceMaster did?
> A   Correct.

S. Mullican Dep. 62:14-22, ECF No. 34-5; *see* K. Mullican Dep. 8:12-10:22, 95:2-97:22 ECF No. 34-26 (Mrs. Mullican, listing all testimony from her husband's deposition, which she had attended in full, with which she disagreed—and not including in that list his testimony that no non-initial-mitigation repairs or replacements had been made to their former home). Thus, any testimony by Mr. Smith regarding the correct amount to be paid

---

[3] Depreciation was not withheld from the costs incurred for the board-up work which immediately followed the fire, and the invoice received from ServiceMaster for work performed for Plaintiffs was paid in full because—unlike the other work estimated for—this work actually was performed. *See* ServiceMaster Invoice, at Mullican-SF_01810 to _01812, ECF No. 34-15; Payments Log, at Mullican-SF_00075, ECF No. 34-8. The work performed by ServiceMaster is not at issue in this lawsuit.

in replacement costs is not helpful because Plaintiffs have no viable argument for why they can recover those types of damages now—having not met the prerequisite of completing such repairs or replacements within the time identified by the Policy.

The U.S. District Court for the Southern District of Mississippi recently rendered two on-point decisions in an analogous case. In *Ferrara Land Management Mississippi, LLC v. Landmark American Insurance Co.*, an insured purchased a policy from an insurance company to insure a warehouse. *See* No. 1:19cv956-HSO-JCG, 2021 WL 4819461, at *1 (S.D. Miss. July 19, 2021). During the policy period, the warehouse was damaged from a break-in. *Id.* The warehouse owner testified that it had been broken into several times before, and, accordingly, the insurer sent the insured a reservation of rights letter, expressing its position that some of the claimed losses occurred before and after the date of loss identified in the at-issue insurance claim. *Id.* The carrier further informed its insured that it would continue its investigation to isolate the damages stemming from the claimed date of loss. *Id.*

The insurer then sued, alleging, *inter alia*, breach of contract and bad faith. *Id.* at *2. During discovery, the insured designated an engineer to testify about "the damage, necessary repairs, estimates, and recommendations as to repairs of damage to the insured property, and as to an electrical assessment." *Id.* at *9. The insurer moved to exclude the engineer's opinions because he "estimated replacement cost only, not actual cash value, which is what [the insurer] would pay under the policy, and because he testified that he did not know that his estimates were prepared to support an insurance claim." *Id.*

The court first noted that, under the terms of the policy, the issue was "whether [the insurer was] obligated to pay [the insured] actual cash value for the damages it sustained" and, "[u]nder the unambiguous terms of the policy, if coverage [was] established, then [the insurer was] responsible for paying actual cash value of the damages" only. *Id.* Further, the policy provided that the insurer would not "pay replacement cost, as opposed to actual cash value, until the lost or damaged property [was] actually repaired or replaced; and unless the repair or replacement [was] made as soon as reasonably possible after the loss or damage.'" *Id.* (cleaned up). There, like here, it was undisputed that the insured warehouse owner had not actually repaired or replaced any of the alleged damages that it had sustained. *Id.* The court therefore excluded the engineer's testimony:

> Because actual cash value is the relevant issue with respect to the calculation of damages in this case, *[the proffered expert's] testimony regarding cost of repair or replacement is irrelevant and any testimony regarding replacement cost, as opposed to actual cash value, would not be helpful to the trier of fact*. In addition, such testimony poses a substantial likelihood of confusing the issues and potentially misleading the jury.

*Id.* at *11 (emphasis added) (citing Fed. R. Evid. 403).

In the same case, the insurer also moved *in limine* to exclude evidence of replacement cost amounts entirely, arguing that such evidence was "not relevant and should be excluded under Federal Rules of Evidence 401 and 402, because under the terms of the policy [the insurer was] not obligated to pay replacement cost for any damaged or missing property not yet repaired or replaced." *Ferrara Land Mgmt. Miss., LLC v. Landmark Am. Ins. Co.*, No. 1:19cv956-HSO-JCG, 2021 WL 5055671, at *3 (S.D. Miss. July 19, 2021). In response, the insured argued that, under Mississippi law, the term "'actual cash value'

9

mean[t] replacement cost and thus the correct calculation of any loss payment [was] replacement cost, despite language referring to actual cash value in the policy." *Id.* The insurer responded that replacement cost value and actual cash value did not have the same meaning because "when reading the term actual cash value in the policy together with the other coverage and valuation provisions, the only reasonable construction [was] that the terms RCV and ACV are different, since RCV replaces ACV when applicable." *Id.* at *4 (cleaned up). The court sided with the carrier, emphasizing the plain language of the at-issue insurance policy:

> The policy in this case unambiguously states that [the insurance company] will not pay replacement cost, as opposed to actual cash value, until the lost or damaged property is actually repaired or replaced; and unless the repair or replacement is made as soon as reasonably possible after the loss or damage. The Court finds the policy is this regard is plain and unambiguous, and that this provision should be enforced as written. It is undisputed that [the insured] has not actually repaired or replaced any of the damage sustained at the warehouse property. Under the plain language of the policy then, [the insured] would not be entitled to recover replacement cost. As such, any evidence of replacement cost is not relevant. Moreover, the probative value of evidence of replacement cost is substantially outweighed by the dangers of confusion of the issues and misleading the jury.

*Id.* (cleaned up) (citing Fed. R. Evid. 401, 402, 403). Respectfully, this Court should reach parallel conclusions with regard to Mr. Smith: that any proffered testimony from him regarding replacement costs is not admissible because the Policy does not permit Plaintiffs to recover replacement costs under the circumstances of this lawsuit because they never repaired or replaced the damages to their dwelling during the period for them to do so. *See id.* at *5 ("[The insurer] is not obligated to pay replacement cost until replacements or

repairs have been made, and it is undisputed that [the insured] has not made any replacements or repairs. Actual cash value is therefore the only relevant loss calculation for damages in this case." (citation omitted)); *see also* Policy, at Mullican-SF_00034, ECF No. 34-1.

All told, Plaintiffs have only two types of damages potentially recoverable under Coverage A for their dwelling: actual cash value and replacement costs. Mr. Smith's testimony is not relevant to the former because he calculated repair and replacement costs utilizing prices from a date other than the "time of loss." Policy, at Mullican-SF_00017, ECF No. 34-1. And Mr. Smith's testimony is not relevant to the latter because Plaintiffs are well past the date by which they would have had to make repairs and replacements to receive replacement cost payments at all.

In *Daubert* terms, his proffered opinions are not "sufficiently 'relevant to the task at hand.'" *Lopez*, 2011 WL 2020699, at *1 (quoting *Bitler*, 400 F.3d at 1234). That is so because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quotation marks and citation omitted); *see* Fed. R. Evid. 401-403. And, even if not expressly barred by these authorities, Mr. Smith's testimony would be confusing to the jury and misleading because, as a matter of law, replacement costs should not be determined by the jury because they are not recoverable, and they therefore are not at issue in this lawsuit. *See* Fed. R. Evid. 403. Mr. Smith's testimony should be excluded.

## **CONCLUSION**

Mr. Smith is qualified to testify regarding pricing issues in many contexts. But, in this case, he was not asked to perform calculations based on correct parameters. Indeed, he was never provided a copy of the Policy at all. *See* **Ex. 2**, Smith Dep. 48:25-50:7; *see also* **Ex. 1**, Smith Report, at SMITH_000002 (listing materials reviewed by Mr. Smith). So he has provided an estimate not applicable to determining actual cash value. And his testimony regarding replacement costs is irrelevant because replacements costs are no longer recoverable. Accordingly, State Farm respectfully requests that the Court exclude the testimony of Plaintiffs' proffered expert witness Duane Smith.

Respectfully submitted,

*s/ Andrew J. Morris*
Andrew J. Morris, OBA #31658
Peyton S. Howell, OBA #33917
McAfee & Taft, a Professional Corporation
8th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102
Telephone:   (405) 235-9621
Facsimile:    (405) 235-0439
andrew.morris@mcafeetaft.com
peyton.howell@mcafeetaft.com

Jessica L. Dickerson, OBA #21500
McAfee & Taft A Professional Corp.
Williams Center Tower II
Two West Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone:       (918) 587-0000
Facsimile:        (918) 599-9317
jessica.dickerson@mcafeetaft.com

**Attorneys for Defendant State Farm Fire and Casualty Company**